Mark REEDER, Appellee,

v.

KANSAS CITY BOARD OF POLICE COMMISSIONERS; Larry L. Joiner; Arthur D. Brookfield, III; John L. Williams; Beverly Parks Barker; Richard L. Berkeley; and William Birt, Appellants.

No. 85–1893.

United States Court of Appeals, Eighth Circuit.

Submitted April 14, 1986.

Decided July 21, 1986.

Rehearing and Rehearing En Banc Denied Aug. 28, 1986.

J. Emmett Logan, Kansas City, Mo., for appellants.

Michael W. Manners, Independence, Mo., for appellee.

Before ROSS, Circuit Judge, HENLEY, Senior Circuit Judge, and ARNOLD, Circuit Judge.

ARNOLD, Circuit Judge.

This case is a challenge, under the Equal Protection Clause of the Fourteenth Amendment, to a Missouri statute which prohibits members of the Kansas City Police Force from participating in or contributing money to political causes and campaigns. No such drastic prohibition on political activity applies to police in other Missouri cities. In an earlier appeal to this Court, *Reeder v. Kansas City Board of Police Commissioners*, 733 F.2d 543 (8th Cir.1984), we rejected arguments that this statute violated the First Amendment and that it attempted to regulate in a field preempted by the 1974 amendments to the Federal Election Campaign Act. We remanded to the District Court for more complete development of the equal protection issue. That Court held that since the statute restricted a fundamental right it must be subjected to strict scrutiny. The trial court then determined that, because the statute was deliberately underinclusive, and the state had not established a compelling reason for the geographical discrimination, the statute violated the Equal Protection Clause. We reverse, finding that under the precedents of the Supreme Court a statute which discriminates between the political subdivisions of a state does not offend the Equal Protection Clause. That clause protects people, not places. So long as the statute treats the same all persons who are similarly situated, i.e., those who are within its jurisdictional reach, regardless of the fact that other statutes apply to other parts of the state, there is no ground for a challenge under the Equal Protection Clause. We therefore need not analyze the statute under the strict scrutiny standard which would otherwise apply when a regulation touches the exercise of fundamental rights. Indeed, under the controlling precedents, this kind of geographical distinction is simply not subject to traditional equal-protection analysis.

I.

Plaintiff Mark Reeder has been employed by the Kansas City Police Department since 1972, at first as a patrolman, and since 1980 as a sergeant. In the summer of 1982, he made a $500 contribution to the campaign of a candidate for the United States Congress. In doing so, he ran afoul of R.S.Mo. § 84.830. That statute is part of a comprehensive regulatory scheme directed exclusively towards the Kansas City Police Department.[1] It for-

---

1. Although the statutes are compiled under a grouping entitled "Provisions Applicable to Kansas City" the actual language of these statutes makes no reference to Kansas City by name. See R.S.Mo. §§ 84.350–.860. Instead, the police provisions are made applicable to cities "that now have, or may hereafter have, three hundred thousand inhabitants and not over seven hundred thousand inhabitants." § 84.350. This locution was apparently necessary in order to avoid violating the provision of the Missouri Constitution prohibiting local or special laws. See Missouri Constitution art. 3, § 40. The Missouri Supreme Court has approved classification of cities or counties by population, even though only one such city exists, so long as other cities could conceivably come within the range of the statute. See, *e.g., Collector of Revenue v. Parcels of Land Encumbered With Delin-*

bids employees and officers of the department to engage in almost any kind of political behavior other than voting.[2] Contributions to candidates or parties are expressly forbidden. The penalty for violation of this provision is summary discharge from employment. The statute also bars violators from re-employment with the department for a period of five years and provides for criminal penalties for willful or culpably negligent violation.

No other police departments in Missouri are subject to similar political restrictions. While the St. Louis department is governed by a comprehensive legislative scheme and operates under the direction of a Board of Commissioners appointed by the Governor, as does the Kansas City department (both departments are actually creatures of the state government, wholly independent of the cities which they serve), the St. Louis provisions in the statutes do not include a political-activity ban. (Rules of the St. Louis department do restrict such activities substantially, but they are not so strict as the Kansas City statute, and they do not

forbid contributions.) Similarly, the statutes governing police forces in first-class cities (which were repealed in 1983, see R.S.Mo. §§ 85.010–.290 (1969)), while vesting control of such forces in a board appointed by the Governor, did not regulate political activity of police personnel. The uniquely strict aspects of the Kansas City police statute derive from efforts to curb serious political corruption of the police department in earlier times when the department was under local control.

## II.

Mr. Reeder does not dispute that the state has an interest in preventing political corruption of police forces, the apparent purpose of this statute. His argument, with which the District Court substantially agreed, is simply this: when the state sets out to regulate the private political conduct of a public employee, that conduct enjoys to some degree the protection of the First Amendment, and the state must regulate with an even hand. If the state chooses to

---

*quent Tax Liens Serial Numbers 1–047 and 1–048,* 517 S.W.2d 49 (Mo.1974).

Nevertheless, we do not doubt that this law was always intended to apply to Kansas City alone, despite the seemingly general language. When first drafted, it was made applicable to cities between 300,000 and 500,000 in population, of which Kansas City was the only one. A separate and similarly comprehensive law applied to cities of over 500,000 population, of which St. Louis was the only one. In 1958, when the population of Kansas City was close to the upper limit of its class, the law was amended to raise the upper limit to 700,000, and the "St. Louis" police law was similarly amended to apply only to cities of over 700,000 population. When, in 1971, the census showed St. Louis with a population of less than 700,000, the legislature prevented that city from falling within the same class as Kansas City by enacting legislation providing that once a "city not located in a county" (St. Louis is the only one) comes under the operation of a law based on its population, a subsequent loss of population does not affect its status. See *State ex rel. McNeal v. Roach,* 520 S.W.2d 69, 74–75 (Mo.1975).

**2.** The statute includes the following:

1. No person shall solicit orally, or by letter or otherwise, or shall be in any manner concerned in soliciting, any assessment, contribu-

tion, or payment for any political purpose whatsoever from any officer or employee in the service of the police department for such cities or from the members of the said police board. No officer, agent, or employee of the police department of such cities shall permit any such solicitation in any building or room occupied for the discharge of the official duties of the said department. No officer or employee in the service of said police department shall directly or indirectly give, pay, lend, or contribute any part of his salary or compensation or any money or other valuable thing to any person on account of, or to be applied to, the promotion of any political party, political club, or any political purpose whatsoever.

2. ... No officer or employee of such department shall be a member or official of any committee of any political party, or be a ward committee man or committee woman, nor shall any such officer or employee solicit any person to vote for or against any candidate for public office, or "poll precincts" or be connected with other political work of similar nature on behalf of any political organization, party, or candidate. All such persons shall, however, retain the right to vote as they may choose and to express their opinions on all political subjects and candidates.

3. ....

R.S.Mo. § 84.830.

restrict the political expression of persons in one locality but not in another, then it is not, according to this view, treating similarly those who are similarly situated. In order to regulate in such an uneven way, the state must show compelling justification.

■ The problem with Mr. Reeder's argument is that the Supreme Court has long held that when the state chooses to regulate differentially, with the laws falling unequally on different geographic areas of the state, the Equal Protection Clause is not violated so long as there is no underlying discrimination against particular persons or groups. The Equal Protection Clause protects people, not places. *McGowan v. Maryland*, 366 U.S. 420, 427, 81 S.Ct. 1101, 1105–06, 6 L.Ed.2d 393 (1961). So long as all persons within the jurisdictional reach of the statute are equally affected by the law, it matters not that those outside the territorial reach of the law are free to behave differently.

The earliest expression of this principle was in *Missouri v. Lewis*, 101 U.S. (11 Otto) 22, 25 L.Ed. 989 (1879). There, the appellant complained of the State of Missouri's dual system of appellate courts, whereby litigants in St. Louis and surrounding counties were limited to an appeal to the St. Louis Court of Appeals in certain classes of cases, while citizens in other areas of the state had an appeal of right to the Missouri Supreme Court. The Supreme Court held that there was no offense to the Equal Protection Clause if the state chose to establish different systems of justice for different parts of the state. "[The Clause] contemplates persons and classes of persons. It has not respect to local and municipal regulations that do not injuriously affect or discriminate between persons or classes of persons within the places or municipalities for which such regulations are made." *Id.*, at 30. The Court noted that in that case there was no allegation that the statute "might be intended as, or might have the effect of, a discrimination against a particular race or class, where such race or class should happen to be the principal occupants of the disfavored district." *Id.* at 32. The Court suggested that if that were the case, then the Equal Protection Clause would be implicated, not by the territorial distinction, but by the underlying race or class distinction.

Similarly, in *Hayes v. Missouri*, 120 U.S. 68, 7 S.Ct. 350, 30 L.Ed. 578 (1887), the Supreme Court upheld a Missouri statute which allowed prosecutors in capital cases to exercise fifteen peremptory challenges in cities of over 100,000 population, but to have only eight challenges in smaller towns. The Court noted that the state had a reasonable basis for the distinction and that in any event the law treated alike persons who were situated alike. *Id.*, 120 U.S. at 72, 7 S.Ct. at 352. And in *Chappell Chemical & Fertilizer Co. v. Sulphur Mines Co.*, 172 U.S. 474, 19 S.Ct. 268, 43 L.Ed. 520 (1899), the Court approved a Maryland statute which authorized trial by jury in all areas of the state except in the City of Baltimore.

But these are old cases. It could be argued that the principle which they express has become vitiated through disuse if there had been no subsequent cases on the point. However, the Court again faced the question of geographic discrimination in *Salsburg v. Maryland*, 346 U.S. 545, 74 S.Ct. 280, 98 L.Ed. 281 (1954). In *Salsburg*, a statute allowed the admission of illegally seized evidence in misdemeanor prosecutions in some counties but required its exclusion in others. The Court reiterated the *Lewis* rule that territorial discrimination alone does not violate the Equal Protection Clause, and added a further rationale for the rule. It said that the state could just as easily have granted home rule to each county and left it to the counties to decide on their separate rules of evidence, and that for the state legislature to enact local legislation, having in mind the needs and desires of the localities, was a matter of discretion for the lawmakers. *Id.* at 552–53, 74 S.Ct. at 284–85.

■ *Salsburg* was an illegal-search case decided in the years before the Fourth

Amendment exclusionary rule was extended to state prosecutions. See *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). There was no underlying federally enforceable right in that case. (The same may be said of the older Supreme Court cases just discussed.) The only ground for challenge was unequal application of state laws. In the present dispute, there is an underlying federal right, i.e., the right to participate in politics. That right is a fundamental one, see *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), though, as we have already held in this case, it is not absolute. Sgt. Reeder suggests that where a fundamental right is involved, the Supreme Court would not follow the precedents of *Lewis* and *Salsburg*. However, this argument must contend with *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). That case involved a challenge to a Sunday-closing statute which exempted certain counties from its provisions, thereby laying a heavier burden on the citizens of the counties not exempted. The Court recognized that a federally protected right was involved and subjected the statute to "the close scrutiny demanded of us when First Amendment liberties are at issue....", *id.* at 449, 81 S.Ct. at 1117, in rejecting an Establishment Clause challenge. As to the geographic discrimination issue, though, the Court relied on *Salsburg*, subjecting the statute to, at the most, rational-basis scrutiny. *Id.* at 426–27, 81 S.Ct. at 1105–06.

The Supreme Court in 1964 again dealt with a state regulatory scheme which bore more heavily on persons in one locality than on those elsewhere. In *Griffin v. School Board of Prince Edward County*, 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964), the State of Virginia, for the purpose of assisting localities in resisting racial integration of the public schools, had enacted legislation which, in effect, provided for integrated public schools in every county but one, Prince Edward County. There, private schools were open to white children; these schools were supported by state and local tuition grants; there were no schools in the county, public or private, which were open to black children. The Court noted that a state has wide discretion to decide which laws shall operate statewide and which shall be local; this is a matter for legislative discretion. However, the Court held, "[w]hatever nonracial grounds might support a State's allowing a county to abandon public schools, the object must be a constitutional one, and grounds of race and opposition to desegregation do not qualify as constitutional." *Id.* at 231, 84 S.Ct. at 1233. In other words, the state's choice to enact local laws must not mask invidious discrimination against a distinct minority group. In *Griffin*, the state's conduct violated the Constitution not because it was local legislation, but because it discriminated impermissibly between races. Had Virginia chosen to close public schools statewide and to substitute a system of white private schools supported through the channeling of public money, as was done in Prince Edward County, its action would have been just as illegal despite the fact that it applied across the board.

More recently, the Court has upheld a Kentucky statute which provided for law-trained judges in misdemeanor cases in the larger municipalities, but allowed for lay judges in the smaller towns. *North v. Russell*, 427 U.S. 328, 96 S.Ct. 2709, 49 L.Ed.2d 534 (1976). The Court concluded that since there was no constitutional flaw in the system generally (the statute allowed for trial de novo before a lawyer-judge in all instances), and since persons in each locality were treated the same, it did not matter that persons in other localities were treated differently. *Id.* at 338–39, 96 S.Ct. at 2714.

■ In all these cases, there is no suggestion that the Supreme Court has wavered from its long-standing view that reasonable territorial distinctions are within the discretion of the legislature. When the enactment in question affects the exercise of a fundamental right, then it must withstand rigorous scrutiny regardless of whether the act has local or general effect.

Once the state has demonstrated, as in *McGowan* and here, that the law serves a compelling public need, and that it does not single out members of a protected class, then it is within the reasonable discretion of the lawmaking body whether to give the law its maximum territorial effect or to restrict its operation to the locality thought to be most in need of it.

■ In our previous opinion in this case, we held that Missouri could choose to restrict the political activities of certain of its public employees. *Reeder v. Kansas City Board of Police Commissioners*, 733 F.2d 543 (8th Cir.1984). See generally *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). We now hold that if the state is justified in applying such restrictions generally and making them effective, as it could, against all police personnel within the state, then it may choose instead to limit the effect of this law to the locality where it is determined to be most needed. The Supreme Court of Missouri has reached the same conclusion. *Pollard v. Board of Police Comm'rs*, 665 S.W.2d 333 (Mo.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 3534, 87 L.Ed.2d 657 (1985). The distinction thus drawn, though vulnerable, is not irrational. It is supported by the history of Kansas City, as well as by a strong local policy, contained in the City Charter, against political activity by public employees. Kansas City, Mo., Charter § 126. This Charter provision does not apply of its own force to the police, which are governed by a board appointed by the Governor, as we have noted, but its existence is strong evidence of the needs and desires of that locality, a factor specifically mentioned by the Supreme Court in *Salsbury*.

■ We deem it appropriate to add that this is one of many cases that demonstrate graphically the limitations of constitutional litigation. If it were our task to judge the wisdom or fairness of this law, we might well come to a different conclusion. That is not our task. In general, wisdom, fairness, and policy of statutes are the business of the legislature, not the courts. Our business is the important but narrow job of comparing what the political branches of government have done with the fundamental law, and upholding the former if there is no conflict. Here, we believe the question is concluded by controlling precedents of the Supreme Court.

Reversed.