## METROPOLITAN WASHINGTON AIRPORTS AUTHORITY ET AL. v. CITIZENS FOR THE ABATEMENT OF AIRCRAFT NOISE, INC., ET AL.

No. 90–906.   Argued April 16, 1991—Decided June 17, 1991

*Deputy Solicitor General Shapiro* argued the cause for the United States as respondent under this Court's Rule 12.4. With him on the briefs were *Acting Solicitor General Bryson, Assistant Attorney General Gerson, Clifford M. Sloan,* and *Douglas Letter.*

*William T. Coleman, Jr.,* argued the cause for petitioners. With him on the briefs were *Donald T. Bliss* and *Debra A. Valentine.*

*Patti A. Goldman* argued the cause and filed a brief for respondents Citizens for Abatement of Aircraft Noise, Inc., et al.*

---

*\*Mary Sue Terry,* Attorney General, *H. Lane Kneedler,* Chief Deputy Attorney General, *K. Marshall Cook,* Deputy Attorney General, *John M. McCarthy,* Senior Assistant Attorney General, and *William W. Muse* and *John Westrick,* Assistant Attorneys General, filed a brief for the Commonwealth of Virginia as *amicus curiae* urging reversal.

JUSTICE STEVENS delivered the opinion of the Court.

An Act of Congress authorizing the transfer of operating control of two major airports from the Federal Government to the Metropolitan Washington Airports Authority (MWAA) conditioned the transfer on the creation by MWAA of a unique "Board of Review" composed of nine Members of Congress and vested with veto power over decisions made by MWAA's Board of Directors.[1] The principal question presented is whether this unusual statutory condition violates the constitutional principle of separation of powers, as interpreted in *INS* v. *Chadha*, 462 U. S. 919 (1983), *Bowsher* v. *Synar*, 478 U. S. 714 (1986), and *Springer* v. *Philippine Islands*, 277 U. S. 189 (1928). We conclude, as did the Court of Appeals for the District of Columbia Circuit, that the condition is unconstitutional.

I

In 1940, Congress authorized the Executive Branch to acquire a tract of land a few miles from the Capitol and to construct what is now Washington National Airport (National). 54 Stat. 686. From the time it opened until 1987, National was owned and operated by the Federal Government. The airport was first managed by the Civil Aeronautics Agency, a division of the Commerce Department. 54 Stat. 688. In 1959, control of National shifted to the newly created Federal Aviation Administration (FAA), an agency that, since 1967, has been a part of the Department of Transportation. See 72 Stat. 731; 80 Stat. 932, 938.

A few years after National opened, the Truman administration proposed that a federal corporation be formed to operate the airport. See Congressional Research Service, Federal Ownership of National and Dulles Airports: Background, Pro-Con Analysis, and Outlook 4 (1985) (CRS Report), reprinted in Hearings before the Subcommittee on

---

[1] Metropolitan Washington Airports Act of 1986 (Transfer Act), 100 Stat. 3341, 49 U. S. C. App. §§ 2451–2461.

Governmental Efficiency and the District of Columbia of the Senate Committee on Governmental Affairs, 99th Cong., 1st Sess., 404 (1985). The proposal was endorsed by the Hoover Commission in 1949 but never adopted by Congress. Instead, when Congress authorized construction of a second major airport to serve the Washington area, it again provided for federal ownership and operation. 64 Stat. 770. Dulles International Airport (Dulles) was opened in 1962 under the direct control of the FAA. See CRS Report 1–2.

National and Dulles are the only two major commercial airports owned by the Federal Government. A third airport, Baltimore Washington International (BWI), which is owned by the State of Maryland, also serves the Washington metropolitan area. Like Dulles, it is larger than National and located in a rural area many miles from the Capitol. Because of its location, National is by far the busiest and most profitable of the three.[2] Although proposals for the joint operating control of all three airports have been considered, the plan that gave rise to this litigation involves only National and Dulles, both of which are located in Virginia. Maryland's interest in the overall problem explains its representation on the Board of Directors of MWAA. See 49 U. S. C. App. § 2456(e)(3)(C).

Throughout its history, National has been the subject of controversy. Its location at the center of the metropolitan area is a great convenience for air travelers, but flight paths over densely populated areas have generated concern among local residents about safety, noise, and pollution. Those liv-

---

[2] "Of the three airports, National, as the Nation's 14th busiest airport (1983), handles by far the most traffic. In 1983, these airports handled passenger volumes of: National, 14.2 million; Dulles, 2.9 million; and BWI, 5.2 million. Other measures of airport activity also indicate a much greater activity level at National. On a combined basis, the [airports] earned the Federal Government a profit of $11.4 million. This profit, however, is entirely the result of activity at National, as Dulles consistently operates at a deficit. BWI, which not long ago operated at a loss, is now a consistent money maker for Maryland." CRS Report 2.

ing closest to the airport have provided the strongest support for proposals to close National or to transfer some of its operations to Dulles. See CRS Report 3.

Despite the FAA's history of profitable operation of National and excellent management of both airports, the Secretary of Transportation concluded that necessary capital improvements could not be financed for either National or Dulles unless control of the airports was transferred to a regional authority with power to raise money by selling tax-exempt bonds.[3] In 1984, she therefore appointed an advisory commission to develop a plan for the creation of such a regional authority. *Id.*, at 6.

The Commission recommended that the proposed authority be created by a congressionally approved compact between Virginia and the District, and that its Board of Directors be composed of 11 members serving staggered 6-year terms, with 5 members to be appointed by the Governor of Virginia, 3 by the Mayor of the District, 2 by the Governor of Maryland, and 1 by the President, with the advice and consent of the Senate. See App. 17. Emphasizing the importance of a "non-political, independent authority," the Commission recommended that members of the board "should not hold elective or appointive political office." *Ibid.* To allay concerns that local interests would not be adequately represented, the Commission recommended a requirement that all

---

[3] "There is no question that the daily management of the airports by the Metropolitan Washington Airports unit of FAA has been excellent. However, inclusion of the airports in the unified Federal budget has generally stymied most efforts to improve or expand facilities at either airport to keep pace with the growing commercial and air travel needs of the Washington area. No major capital projects have been financed at either airport from Federal appropriations since the construction of Dulles in the early 1960's. Given the continuing need to limit federal expenditures to reduce Federal deficits, it is unlikely that any significant capital improvements could be undertaken at the airports in the foreseeable future." S. Rep. No. 99–193, p. 2 (1985).

board members except the Presidential appointee reside in the Washington metropolitan area.  *Ibid.*

In 1985, Virginia and the District both passed legislation authorizing the establishment of the recommended regional authority.  See 1985 Va. Acts, ch. 598; 1985 D. C. Law 6–67. A bill embodying the advisory commission's recommendations passed the Senate.  See 132 Cong. Rec. 7263–7281 (1986).  In the House of Representatives, however, the legislation encountered strong opposition from Members who expressed concern that the surrender of federal control of the airports might result in the transfer of a significant amount of traffic from National to Dulles.  See Hearings on H. R. 2337, H. R. 5040, and S. 1017 before the Subcommittee on Aviation of the House Committee on Public Works and Transportation, 99th Cong., 2d Sess., 1–3, 22 (1986).

Substitute bills were therefore drafted to provide for the establishment of a review board with veto power over major actions of MWAA's Board of Directors.  Under two of the proposals, the board of review would clearly have acted as an agent of the Congress.  After Congress received an opinion from the Department of Justice that a veto of MWAA action by such a board of review "would plainly be legislative action that must conform to the requirements of Article 1, section 7 of the Constitution," [4] the Senate adopted a version of the re-

---

[4] "Two of the suggestions made by the staff would present substantial constitutional problems.  The first of these proposals would create a 'Federal Board of Directors,' consisting of three members of the House, appointed by the Speaker, three members of the Senate, appointed by the President pro tempore, and the Comptroller General.  As proposed, this Federal Board would clearly be unconstitutional.  In reality the Federal Board would be no more than a committee of Congress plus the Comptroller General—who is clearly a legislative officer.  This committee would be authorized by the bill to veto certain types of actions otherwise within the Airports Authority's power under applicable state law.  In the absence of the Federal Board, the Airports Authority could implement those decisions without further review or approval.  Disapproval by the Federal Board of a particular action would thus have 'the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative

view board that required Members of Congress to serve in their individual capacities as representatives of users of the airports. See 132 Cong. Rec. 28372–28375, 28504, 28521–28525 (1986). The provision was further amended in the House, *id.*, at 32127–32144, and the Senate concurred, *id.*, at 32483. Ultimately, § 2456(f) of the Transfer Act, as enacted, defined the composition and powers of the Board of Review in much greater detail than the Board of Directors. Compare 49 U. S. C. App. § 2456(f) with § 2456(e).

Subparagraph (1) of § 2456(f) specifies that the Board of Review "shall consist" of nine Members of the Congress, eight of whom serve on committees with jurisdiction over transportation issues and none of whom may be a Member from Maryland, Virginia, or the District of Columbia.[5] Sub-

---

Branch,' *INS* v. *Chadha*, 462 U. S. 919, 952 (1983), and would plainly be legislative action that must conform to the requirements of Article 1, section 7 of the Constitution: passage by both Houses and approval by the President. *Id.* at 954–955. Congress cannot directly vest the Federal Board with authority to veto decisions made by the Airports Authority any more than it can authorize one House, one committee, or one officer to overturn the Attorney General's decision to allow a deportable alien to remain in the United States, to reject rules implemented by an executive agency pursuant to delegated authority, to dictate mandatory budget cuts to be made by the President, or to overturn any decision made by a state agency." App. 26–27 (footnotes omitted).

[5] "The board of directors shall be subject to review of its actions and to requests, in accordance with this subsection, by a Board of Review of the Airports Authority. Such Board of Review shall be established by the board of directors and shall consist of the following, in their individual capacities, as representatives of users of the Metropolitan Washington Airports:

"(A) two members of the Public Works and Transportation Committee and two members of the Appropriations Committee of the House of Representatives from a list provided by the Speaker of the House;

"(B) two members of the Commerce, Science, and Transportation Committee and two members of the Appropriations Committee of the Senate from a list provided by the President pro tempore of the Senate; and

"(C) one member chosen alternatively from members of the House of Representatives and members of the Senate, from a list provided by

paragraph (4)(B) details the actions that must be submitted to the Board of Review for approval, which include adoption of a budget, authorization of bonds, promulgation of regulations, endorsement of a master plan, and appointment of the chief executive officer of the Authority.[6] Subparagraph (4)(D) explains that disapproval by the Board will prevent submitted actions from taking effect.[7] Other significant provisions of the Act include subparagraph (5), which authorizes the Board of Review to require Authority directors to consider any action relating to the airports;[8] subsection (g), which requires that any action changing the hours of operation at either National or Dulles be taken by regulation and therefore be subject to veto by the Board of Review;[9] and

---

the Speaker of the House or the President pro tempore of the Senate, respectively.

"The members of the Board of Review shall elect a chairman. A member of the House of Representatives or the Senate from Maryland or Virginia and the Delegate from the District of Columbia may not serve on the Board of Review." 49 U. S. C. App. § 2456(f)(1).

[6] "The following are the actions referred to in subparagraph (A):

"(i) the adoption of an annual budget;

"(ii) the authorization for the issuance of bonds;

"(iii) the adoption, amendment, or repeal of a regulation;

"(iv) the adoption or revision of a master plan, including any proposal for land acquisition; and

"(v) the appointment of the chief executive officer." § 2456(f)(4)(B).

[7] "An action disapproved under this paragraph shall not take effect. Unless an annual budget for a fiscal year has taken effect in accordance with this paragraph, the Airports Authority may not obligate or expend any money in such fiscal year, except for (i) debt service on previously authorized obligations, and (ii) obligations and expenditures for previously authorized capital expenditures and routine operating expenses." § 2456(f)(4)(D).

[8] "The Board of Review may request the Airports Authority to consider and vote, or to report, on any matter related to the Metropolitan Washington Airports. Upon receipt of such a request the Airports Authority shall consider and vote, or report, on the matter as promptly as feasible." § 2456(f)(5).

[9] "Any action of the Airports Authority changing, or having the effect of changing, the hours of operation of or the type of aircraft serving either of

subsection (h), which contains a provision disabling MWAA's Board of Directors from performing any action subject to the veto power if a court should hold that the Board of Review provisions of the Act are invalid.[10]

On March 2, 1987, the Secretary of Transportation and MWAA entered into a long-term lease complying with all of the conditions specified in the then recently enacted Transfer Act. See App. to Pet. for Cert. 163a–187a. The lease provided for a 50-year term and annual rental payments of $3 million "in 1987 dollars." *Id.*, at 170a, 178a. After the lease was executed, MWAA's Board of Directors adopted bylaws providing for the Board of Review, *id.*, at 151a–154a, and Virginia and the District of Columbia amended their legislation to give MWAA power to establish the Board of Review, 1987 Va. Acts, ch. 665; 1987 D. C. Law 7–18. On September 2, 1987, the directors appointed the nine members of the Board of Review from lists that had been submitted by the Speaker of the House of Representatives and the President *pro tempore* of the Senate. App. 57–58.

On March 16, 1988, MWAA's Board of Directors adopted a master plan providing for the construction of a new terminal at National with gates capable of handling larger aircraft, an additional taxiway turnoff to reduce aircraft time on the runway and thereby improve airport capacity, a new dual-level roadway system, and new parking facilities. *Id.*, at 70–71, 89–91. On April 13, the Board of Review met and voted not to disapprove the master plan. *Id.*, at 73–78.

## II

In November 1988, Citizens for the Abatement of Aircraft Noise, Inc., and two individuals who reside under flight

the Metropolitan Washington Airports may be taken only by regulation of the Airports Authority." § 2456(g).

[10] "If the Board of Review established under subsection (f) of this section is unable to carry out its functions under this subchapter by reason of a judicial order, the Airports Authority shall have no authority to perform any of the actions that are required by paragraph (f)(4) of this section to be submitted to the Board of Review." § 2456(h).

paths of aircraft departing from, and arriving at, National (collectively CAAN) brought this action. CAAN sought a declaration that the Board of Review's power to veto actions of MWAA's Board of Directors is unconstitutional and an injunction against any action by the Board of Review as well as any action by the Board of Directors that is subject to Board of Review approval. *Id.*, at 10. The complaint alleged that most of the members of CAAN live under flight paths to and from National and that CAAN's primary purpose is to develop and implement a transportation policy for the Washington area that would include balanced service among its three major airports, thus reducing the operations at National and alleviating noise, safety, and air pollution problems associated with such operations. *Id.*, at 4. The complaint named MWAA and its Board of Review as defendants. *Id.*, at 5.

The District Court granted the defendants' motion for summary judgment. 718 F. Supp. 974 (DC 1989). As a preliminary matter, however, the court held that plaintiffs had standing to maintain the action for two reasons:[11] first, because the master plan will facilitate increased activity at National that is harmful to plaintiffs, and second, because the composition of the Board of Review diminishes the influence of CAAN on airport user issues since local congressmen and senators are ineligible for service on the Board. *Id.*, at 980–982. On the merits, the District Court concluded that there was no violation of the doctrine of separation of powers because the members of the Board of Review acted in their individual capacities as representatives of airport users, and therefore the Board was not an agent of Congress. *Id.*, at 985. Moreover, the Board's powers were derived from the legislation enacted by Virginia and the District, as implemented by MWAA's bylaws, rather than from the Transfer

---

[11] The District Court also rejected the arguments that the case was not ripe for review and that plaintiffs had failed to exhaust administrative remedies. 718 F. Supp., at 979–980.

Act. *Id.*, at 986. "In short, because Congress exercises no federal power under the Act, it cannot overstep its constitutionally-designated bounds." *Ibid.*

A divided panel of the Court of Appeals for the District of Columbia Circuit reversed. 286 U. S. App. D. C. 334, 917 F. 2d 48 (1990). The court agreed that plaintiffs had standing because they had alleged a distinct and palpable injury that was "fairly traceable" to the implementation of the master plan and a favorable ruling would prevent MWAA from implementing that plan. *Id.*, at 339, 917 F. 2d, at 53. On the merits, the majority concluded that it was "wholly unrealistic to view the Board of Review as solely a creature of state law immune to separation-of-powers scrutiny" because it was federal law that had required the establishment of the Board and defined its powers. *Id.*, at 340, 917 F. 2d, at 54. It held that the Board was "in essence a congressional agent" with disapproval powers over key operational decisions that were "quintessentially executive," *id.*, at 343, 917 F. 2d, at 57, and therefore violated the separation of powers, *ibid.* The dissenting judge, emphasizing the importance of construing federal statutes to avoid constitutional questions when fairly possible, concluded that the Board of Review should not be characterized as a federal entity but that, even if it were so characterized, its members could, consistent with the Constitution, serve in their individual capacities even though they were Members of Congress. *Id.*, at 345–347, 917 F. 2d, at 59–61.

Because of the importance of the constitutional question, we granted MWAA's petition for certiorari. 498 U. S. 1045–1046 (1991). Although the United States intervened in the Court of Appeals to support the constitutionality of the Transfer Act, see 28 U. S. C. § 2403(a), the United States did not join in MWAA's petition for certiorari. As a respondent in this Court pursuant to this Court's Rule 12.4, the United

States has again taken the position that the Transfer Act is constitutional.[12]

## III

Petitioners (MWAA and the Board of Review) renew the challenge to respondents' standing that was rejected by the District Court and the Court of Appeals. To establish standing, respondents "must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen* v. *Wright,* 468 U. S. 737, 751 (1984). Petitioners argue that respondents' asserted injuries are caused by factors independent of the Board of Review's veto power and that the injuries will not be cured by invalidation of the Board of Review. We believe that petitioners are mistaken.

Respondents alleged that the master plan allows increased air traffic at National and a consequent increase in accident risks, noise, and pollution. App. 10. "For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint." *Warth* v. *Seldin,* 422 U. S. 490, 501 (1975). If we accept that the master plan's provisions will result in increased noise, pollution, and danger of accidents,

---

[12] Rule 12.4 provides that "[a]ll parties to the proceeding in the court whose judgment is sought to be reviewed shall be deemed parties in this Court, unless the petitioner notifies the Clerk of this Court in writing of the petitioner's belief that one or more of the parties below has no interest in the outcome of the petition. . . . All parties other than petitioners shall be respondents. . . ." Even though the United States is technically a respondent under Rule 12.4, we shall use the term "respondents" to refer solely to plaintiffs.

The United States does not support the position taken by petitioners and the dissent. The United States argues that "[i]f the exercise of state authority were sufficient in itself to validate a statutorily imposed condition like the one in this case, a massive loophole in the separation of powers would be opened." Brief for United States 31. According to the United States, the condition in this case is constitutional only because "there is here a reasonable basis for the appointment of Members of Congress 'in their individual capacities.'" *Id.,* at 33.

this "personal injury" to respondents is "fairly traceable" to the Board of Review's veto power because knowledge that the master plan was subject to the veto power undoubtedly influenced MWAA's Board of Directors when it drew up the plan. Because invalidation of the veto power will prevent the enactment of the master plan, see 49 U. S. C. App. § 2456(h), the relief respondents have requested is likely to redress their alleged injury. Moreover, the harm respondents have alleged is not confined to the consequences of a possible increase in the level of activity at National. The harm also includes the creation of an impediment to a reduction in that activity. See App. 8. The Board of Review was created by Congress as a mechanism to preserve operations at National at their present level, or at a higher level if possible. See *supra*, at 258. The Board of Review and the master plan, which even petitioners acknowledge is at a minimum "noise neutral," Brief for Petitioners 37–38, therefore injure CAAN by making it more difficult for CAAN to reduce noise and activity at National.[13]

## IV

Petitioners argue that this case does not raise any separation-of-powers issue because the Board of Review neither exercises federal power nor acts as an agent of Congress. Examining the origin and structure of the Board, we conclude that petitioners are incorrect.

---

[13] In the lower courts, petitioners also challenged this action on ripeness grounds. Although petitioners do not press this issue on appeal, it concerns our jurisdiction under Article III, so we must consider the question on our own initiative. See *Liberty Mut. Ins. Co.* v. *Wetzel*, 424 U. S. 737, 740 (1976). We have no trouble concluding, however, that a challenge to the Board of Review's veto power is ripe even if the veto power has not been exercised to respondents' detriment. The threat of the veto hangs over the Board of Directors like the sword over Damocles, creating a "here-and-now subservience" to the Board of Review sufficient to raise constitutional questions. See *Bowsher* v. *Synar*, 478 U. S. 714, 727, n. 5 (1986).

Petitioners lay great stress on the fact that the Board of Review was established by the bylaws of MWAA, which was created by legislation enacted by the Commonwealth of Virginia and the District of Columbia. Putting aside the unsettled question whether the District of Columbia acts as a State or as an agent of the Federal Government for separation-of-powers purposes, we believe the fact that the Board of Review was created by state enactments is not enough to immunize it from separation-of-powers review. Several factors combine to mandate this result.

Control over National and Dulles was originally in federal hands, and was transferred to MWAA only subject to the condition that the States create the Board of Review. Congress placed such significance on the Board that it required that the Board's invalidation prevent MWAA from taking any action that would have been subject to Board oversight. See 49 U. S. C. App. § 2456(h). Moreover, the Federal Government has a strong and continuing interest in the efficient operation of the airports, which are vital to the smooth conduct of Government business, especially to the work of Congress, whose Members must maintain offices in both Washington and the districts that they represent and must shuttle back and forth according to the dictates of busy and often unpredictable schedules. This federal interest was identified in the preamble to the Transfer Act,[14] justified a Presidential appointee on the Board of Directors, and motivated the creation of the Board of Review, the structure and the powers of which Congress mandated in detail, see § 2456(f). Most sig-

---

[14] "The Congress finds that —

"(3) the Federal Government has a continuing but limited interest in the operation of the two federally owned airports, which serve the travel and cargo needs of the entire Metropolitan Washington region as well as the District of Columbia as the national seat of government." 49 U. S. C. App. § 2451.

nificant, membership on the Board of Review is limited to federal officials, specifically members of congressional committees charged with authority over air transportation.

That the Members of Congress who serve on the Board nominally serve "in their individual capacities, as representatives of users" of the airports, § 2456(f)(1), does not prevent this group of officials from qualifying as a congressional agent exercising federal authority for separation-of-powers purposes. As we recently held, "separation-of-powers analysis does not turn on the labeling of an activity," *Mistretta* v. *United States*, 488 U. S. 361, 393 (1989). The Transfer Act imposes no requirement that the Members of Congress who are appointed to the Board actually be users of the airports. Rather, the Act imposes the requirement that the Board members have congressional responsibilities related to the federal regulation of air transportation. These facts belie the *ipse dixit* that the Board members will act "in their individual capacities."

Although the legislative history is not necessary to our conclusion that the Board members act in their official congressional capacities, the floor debates in the House confirm our view. See, *e. g.*, 132 Cong. Rec. 32135 (1986) (The bill "also provides for continuing congressional review over the major decisions of the new airport authority. A Congressional Board will still have veto power over the new airport authority's: annual budget; issuance of bonds; regulations; master plan; and the naming of the Chief Executive Officer") (Rep. Lehman); *id.*, at 32136 ("In addition, the motion provides continued congressional control over both airports. Congress would retain oversight through a Board of Review made up of nine Members of Congress. This Board would have the right to overturn major decisions of the airport authority") (Rep. Coughlin); *id.*, at 32137 ("Under this plan, Congress retains enough control of the airports to deal with any unseen pitfalls resulting from this transfer of author-

ity. . . . We are getting our cake and eating it too. . . . The beauty of the deal is that Congress retains its control without spending a dime") (Rep. Smith); *id.*, at 32141 ("There is, however, a congressional board which is established by this. . . . [T]hat board has been established to make sure that the Nation's interest, the congressional interest was attended to in the consideration of how these two airports are operated") (Rep. Hoyer); *id.*, at 32142 (The bill does "not give up congressional control and oversight—that remains in a Congressional Board of review") (Rep. Conte); *id.*, at 32143 ("I understand that one concern of Members is that by leasing these airports to a local authority, we would be losing control over them. But, in fact, under this bill exactly the opposite is true. We will have more control than before") (Rep. Hammerschmidt).

Congress as a body also exercises substantial power over the appointment and removal of the particular Members of Congress who serve on the Board. The Transfer Act provides that the Board "shall consist" of "two members of the Public Works and Transportation Committee and two members of the Appropriations Committee of the House of Representatives from a list provided by the Speaker of the House," "two members of the Commerce, Science, and Transportation Committee and two members of the Appropriations Committee of the Senate from a list provided by the President pro tempore of the Senate," and "one member chosen alternately . . . from a list provided by the Speaker of the House or the President pro tempore of the Senate, respectively." 49 U. S. C. App. § 2456(f)(1). Significantly, appointments *must* be made from the lists, and there is no requirement that the lists contain more recommendations than the number of Board openings. Cf. 28 U. S. C. § 991(a) (Sentencing Reform Act upheld in *Mistretta* required only that the President "conside[r]" the recommendations of the Judicial Conference); 31 U. S. C. § 703(a) (Congressional

Commission only "recommend[s]" individuals for selection as Comptroller General). The list system, combined with congressional authority over committee assignments, guarantees Congress effective control over appointments. Control over committee assignments also gives Congress effective removal power over Board members because depriving a Board member of membership in the relevant committees deprives the member of authority to sit on the Board. See 49 U. S. C. App. § 2456(f)(1) (Board "shall consist" of relevant committee members).[15]

We thus confront an entity created at the initiative of Congress, the powers of which Congress has delineated, the purpose of which is to protect an acknowledged federal interest, and membership in which is restricted to congressional officials. Such an entity necessarily exercises sufficient federal power as an agent of Congress to mandate separation-of-powers scrutiny. Any other conclusion would permit Congress to evade the "carefully crafted" constraints of the Constitution, *INS* v. *Chadha*, 462 U. S. 919, 959 (1983), simply by delegating primary responsibility for execution of national

---

[15] Thus, whether or not the statute gives MWAA formal appointment and removal power over the Board of Review is irrelevant. Also irrelevant for separation-of-powers purposes is the likelihood that Congress will discipline Board members by depriving them of committee membership. See *Bowsher*, 478 U. S., at 730 (rejecting relevance of likelihood that Congress would actually remove the Comptroller General). The dissenting judge on the Court of Appeals suggested that a constitutional problem could be avoided by reading the statute's requirement that Board members be members of particular congressional committees as applying only at the time of appointment. See 286 U. S. App. D. C. 334, 347, 917 F. 2d 48, 61 (1990) (Mikva, J., dissenting). We do not dispute that statutes should be interpreted, if possible, to avoid constitutional difficulties. See, *e. g.*, *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council*, 485 U. S. 568, 575 (1988). However, the statutory language unambiguously requires that the Board of Review "shall consist" of members of certain congressional committees. The Transfer Act cannot fairly be read to impose this requirement only at the time of appointment.

policy to the States, subject to the veto power of Members of Congress acting "in their individual capacities." Cf. *Bowsher* v. *Synar*, 478 U. S., at 755 (STEVENS, J., concurring in judgment).[16]

Petitioners contend that the Board of Review should nevertheless be immune from scrutiny for constitutional defects because it was created in the course of Congress' exercise of its power to dispose of federal property.　See U. S. Const., Art. IV, § 3, cl. 2.[17]　In *South Dakota* v. *Dole*, 483 U. S. 203 (1987), we held that a grant of highway funds to a State conditioned on the State's prohibition of the possession of alcoholic beverages by persons under the age of 21 was a lawful exercise of Congress' power to spend money for the general welfare.　See U. S. Const., Art. I, § 8, cl. 1.　Even assuming that "Congress might lack the power to impose a national minimum drinking age directly," we held that this indirect "encouragement to state action" was a valid use of the spending power.　*Dole*, 483 U. S., at 212.　We thus concluded that Congress could endeavor to accomplish the federal objective of regulating the national drinking age by the indirect use of the spending power even though that regulatory au-

---

[16] Petitioners and the United States both place great weight on the fact that the Framers at the Constitutional Convention expressly rejected a constitutional provision that would have prohibited an individual from holding both state and federal office.　Brief for Petitioners 15; Brief for United States 21–23.　The Framers apparently were concerned that such a prohibition would limit the pool of talented citizens to one level of government or the other.　See 1 M. Farrand, Records of the Federal Convention of 1787, pp. 20–21, 217, 386, 389, 428–429 (1911).　Neither petitioners nor the United States, however, point to any endorsement by the Framers of offices that are nominally created by the State but for which concurrent federal office is a prerequisite.

[17] U. S. Const., Art. IV, § 3, cl. 2, provides in relevant part:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States."

thority would otherwise be a matter within state control pursuant to the Twenty-first Amendment.[18]

Our holding in *Dole* did not involve separation-of-powers principles. It concerned only the allocation of power between the Federal Government and the States. Our reasoning that, absent coercion, a sovereign State has both the incentive and the ability to protect its own rights and powers, and therefore may cede such rights and powers, see *id.*, at 210–211, is inapplicable to the issue presented by this case. Here, unlike *Dole*, there is no question about federal power to operate the airports. The question is whether the maintenance of federal control over the airports by means of the Board of Review, which is allegedly a federal instrumentality, is invalid, not because it invades any state power, but because Congress' continued control violates the separation-of-powers principle, the aim of which is to protect not the States but "the whole people from improvident laws." *Chadha*, 462 U. S., at 951. Nothing in our opinion in *Dole* implied that a highway grant to a State could have been conditioned on the State's creating a "Highway Board of Review" composed of Members of Congress. We must therefore consider whether the powers of the Board of Review may, consistent with the separation of powers, be exercised by an agent of Congress.

## V

Because National and Dulles are the property of the Federal Government and their operations directly affect inter-

---

[18] U. S. Const., Amdt. 21, provides:

"SECTION 1. The eighteenth article of amendment to the Constitution of the United States is hereby repealed.

"SEC. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

"SEC. 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by conventions in several States, as provided in the Constitution, within seven years from the date of the submission hereof to the States by the Congress."

state commerce, there is no doubt concerning the ultimate power of Congress to enact legislation defining the policies that govern those operations. Congress itself can formulate the details, or it can enact general standards and assign to the Executive Branch the responsibility for making necessary managerial decisions in conformance with those standards. The question presented is only whether the Legislature has followed a constitutionally acceptable procedure in delegating decisionmaking authority to the Board of Review.

The structure of our Government as conceived by the Framers of our Constitution disperses the federal power among the three branches—the Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each. The ultimate purpose of this separation of powers is to protect the liberty and security of the governed. As former Attorney General Levi explained:

> "The essence of the separation of powers concept formulated by the Founders from the political experience and philosophy of the revolutionary era is that each branch, in different ways, within the sphere of its defined powers and subject to the distinct institutional responsibilities of the others is essential to the liberty and security of the people. Each branch, in its own way, is the people's agent, its fiduciary for certain purposes.
>
> .    .    .    .    .
>
> "Fiduciaries do not meet their obligations by arrogating to themselves the distinct duties of their master's other agents." Levi, Some Aspects of Separation of Powers, 76 Colum. L. Rev. 385–386 (1976).

Violations of the separation-of-powers principle have been uncommon because each branch has traditionally respected the prerogatives of the other two. Nevertheless, the Court has been sensitive to its responsibility to enforce the principle when necessary.

"Time and again we have reaffirmed the importance in our constitutional scheme of the separation of governmental powers into the three coordinate branches. See, e. g., *Bowsher* v. *Synar*, 478 U. S., at 725 (citing *Humphrey's Executor*, 295 U. S., at 629–630). As we stated in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), the system of separated powers and checks and balances established in the Constitution was regarded by the Framers as 'a self-executing safeguard against the encroachment or aggrandizement of one branch at the expense of the other.' *Id.*, at 122. We have not hesitated to invalidate provisions of law which violate this principle. See *id.*, at 123." *Morrison* v. *Olson*, 487 U. S. 654, 693 (1988).

The abuses by the monarch recounted in the Declaration of Independence provide dramatic evidence of the threat to liberty posed by a too powerful executive. But, as James Madison recognized, the representatives of the majority in a democratic society, if unconstrained, may pose a similar threat:

"It will not be denied, that power is of an encroaching nature, and that it ought to be effectually restrained from passing the limits assigned to it.

.       .       .       .       .

"The founders of our republics . . . seem never for a moment to have turned their eyes from the danger to liberty from the overgrown and all-grasping prerogative of an hereditary magistrate, supported and fortified by an hereditary branch of the legislative authority. They seem never to have recollected the danger from legislative usurpations; which by assembling all power in the same hands, must lead to the same tyranny as is threatened by executive usurpations. . . . [It] is against the enterprising ambition of this department, that the people ought to indulge all their jealousy and exhaust all their precautions.

"The legislative department derives a superiority in our governments from other circumstances. Its con-

stitutional powers being at once more extensive and less susceptible of precise limits, it can with the greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments. It is not unfrequently a question of real-nicety in legislative bodies, whether the operation of a particular measure, will, or will not extend beyond the legislative sphere." The Federalist No. 48, pp. 332–334 (J. Cooke ed. 1961).

To forestall the danger of encroachment "beyond the legislative sphere," the Constitution imposes two basic and related constraints on the Congress. It may not "invest itself or its Members with either executive power or judicial power." *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394, 406 (1928). And, when it exercises its legislative power, it must follow the "single, finely wrought and exhaustively considered, procedures" specified in Article I. *INS* v. *Chadha*, 462 U. S., at 951.[19]

The first constraint is illustrated by the Court's holdings in *Springer* v. *Philippine Islands*, 277 U. S. 189 (1928), and *Bowsher* v. *Synar*, 478 U. S. 714 (1986). *Springer* involved the validity of Acts of the Philippine Legislature that authorized a committee of three—two legislators and one executive—to vote corporate stock owned by the Philippine Government. Because the Organic Act of the Philippine Islands incorporated the separation-of-powers principle, and because the challenged statute authorized two legislators to perform

---

[19] "As we emphasized in *Chadha*, when Congress legislates, when it makes binding policy, it must follow the procedures prescribed in Article I. Neither the unquestioned urgency of the national budget crisis nor the Comptroller General's proud record of professionalism and dedication provides a justification for allowing a congressional agent to set policy that binds the Nation. Rather than turning the task over to its agent, if the Legislative Branch decides to act with conclusive effect, it must do so through a process akin to that specified in the fallback provision—through enactment by both Houses and presentment to the President." *Bowsher*, 478 U. S., at 757–759 (STEVENS, J., concurring in judgment).

the executive function of controlling the management of the government-owned corporations, the Court held the statutes invalid. Our more recent decision in *Bowsher* involved a delegation of authority to the Comptroller General to revise the federal budget. After concluding that the Comptroller General was in effect an agent of Congress, the Court held that he could not exercise executive powers:

> "To permit the execution of the laws to be vested in an officer answerable only to Congress would, in practical terms, reserve in Congress control over the execution of the laws. . . . The structure of the Constitution does not permit Congress to execute the laws; it follows that Congress cannot grant to an officer under its control what it does not possess." *Bowsher*, 478 U. S., at 726.

The second constraint is illustrated by our decision in *Chadha.* That case involved the validity of a statute that authorized either House of Congress by resolution to invalidate a decision by the Attorney General to allow a deportable alien to remain in the United States. Congress had the power to achieve that result through legislation, but the statute was nevertheless invalid because Congress cannot exercise its legislative power to enact laws without following the bicameral and presentment procedures specified in Article I. For the same reason, an attempt to characterize the budgetary action of the Comptroller General in *Bowsher* as legislative action would not have saved its constitutionality because Congress may not delegate the power to legislate to its own agents or to its own Members.[20]

Respondents rely on both of these constraints in their challenge to the Board of Review. The Court of Appeals found it unnecessary to discuss the second constraint because the

---

[20] "If Congress were free to delegate its policymaking authority to one of its components, or to one of its agents, it would be able to evade 'the carefully crafted restraints spelled out in the Constitution.' [*Chadha,* 462 U. S.,] at 959." *Bowsher*, 478 U. S., at 755 (STEVENS, J., concurring in judgment).

court was satisfied that the power exercised by the Board of Review over "key operational decisions is quintessentially executive." 286 U. S. App. D. C., at 342, 917 F. 2d, at 56. We need not agree or disagree with this characterization by the Court of Appeals to conclude that the Board of Review's power is constitutionally impermissible. If the power is executive, the Constitution does not permit an agent of Congress to exercise it. If the power is legislative, Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, § 7. In short, when Congress "[takes] action that ha[s] the purpose and effect of altering the legal rights, duties, and relations of persons . . . outside the Legislative Branch," it must take that action by the procedures authorized in the Constitution. See *Chadha*, 462 U. S., at 952–955.[21]

One might argue that the provision for a Board of Review is the kind of practical accommodation between the Legislature and the Executive that should be permitted in a "workable government."[22] Admittedly, Congress imposed its will on the regional authority created by the District of Columbia and the Commonwealth of Virginia by means that are unique

---

[21] The Constitution does permit Congress or a part of Congress to take some actions with effects outside the Legislative Branch by means other than the provisions of Art. I, § 7. These include at least the power of the House alone to initiate impeachments, Art. I, § 2, cl. 5; the power of the Senate alone to try impeachments, Art. I, § 3, cl. 6; the power of the Senate alone to approve or disapprove Presidential appointments, Art. II, § 2, cl. 2; and the power of the Senate alone to ratify treaties, Art. II, § 2, cl. 2. See also Art. II, § 1, and Amdt. 12 (congressional role in Presidential election process); Art. V (congressional role in amendment process). Moreover, Congress can, of course, manage its own affairs without complying with the constraints of Art. I, § 7. See *Chadha*, 462 U. S., at 954, n. 16; *Bowsher*, 478 U. S., at 753–756 (STEVENS, J., concurring in judgment).

[22] "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 635 (1952) (Jackson, J., concurring).

and that might prove to be innocuous. However, the statutory scheme challenged today provides a blueprint for extensive expansion of the legislative power beyond its constitutionally confined role. Given the scope of the federal power to dispense benefits to the States in a variety of forms and subject to a host of statutory conditions, Congress could, if this Board of Review were valid, use similar expedients to enable its Members or its agents to retain control, outside the ordinary legislative process, of the activities of state grant recipients charged with executing virtually every aspect of national policy. As James Madison presciently observed, the legislature "can with greater facility, mask under complicated and indirect measures, the encroachments which it makes on the co-ordinate departments." The Federalist No. 48, at 334. Heeding his warning that legislative "power is of an encroaching nature," we conclude that the Board of Review is an impermissible encroachment.[23]

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE MARSHALL join, dissenting.

Today the Court strikes down yet another innovative and otherwise lawful governmental experiment in the name of separation of powers. To reach this result, the majority must strain to bring state enactments within the ambit of a doctrine hitherto applicable only to the Federal Government and strain again to extend the doctrine even though both Congress and the Executive argue for the constitutionality of

---

[23] Because we invalidate the Board of Review under basic separation-of-powers principles, we need not address respondents' claim that Members of Congress serve on the Board in violation of the Incompatibility and Ineligibility Clauses. See U. S. Const., Art. I, § 6. We also express no opinion on whether the appointment process of the Board of Review contravenes the Appointments Clause, U. S. Const., Art. II, § 2, cl. 2.

the arrangement which the Court invalidates. These efforts are untenable because they violate the "'cardinal principle that this Court will first ascertain whether a construction of [a] statute is fairly possible by which the [constitutional] question may be avoided.'" *Ashwander* v. *TVA*, 297 U. S. 288, 348 (1936) (Brandeis, J., concurring), (quoting *Crowell* v. *Benson*, 285 U. S. 22, 62 (1932)). They are also untenable because the Court's separation-of-powers cases in no way compel the decision the majority reaches.

## I

For the first time in its history, the Court employs separation-of-powers doctrine to invalidate a body created under state law. The majority justifies this unprecedented step on the ground that the Board of Review "exercises sufficient federal power . . . to mandate separation-of-powers scrutiny." *Ante*, at 269. This conclusion follows, it is claimed, because the Board, as presently constituted, would not exist but for the conditions set by Congress in the Metropolitan Washington Airports Act of 1986 (Transfer Act), 49 U. S. C. App. § 2456(h)(1). This unprecedented rationale is insufficient on at least two counts. The Court's reasoning fails first because it ignores the plain terms of every instrument relevant to this case. The Court further errs because it also misapprehends the nature of the Transfer Act as a lawful exercise of congressional authority under the Property Clause. U. S. Const., Art. IV, § 3, cl. 2.

## A

Both the Airports Authority (Authority) and the Board are clearly creatures of state law. The Authority came into being exclusively by virtue of acts passed by the Commonwealth of Virginia, 1985 Va. Acts, ch. 598, § 2, and the District of Columbia, 1985 D. C. Law 6–67, § 3.[1] These en-

---

[1] The District of Columbia, of course, is not a State under the Constitution. See, *e. g., Hepburn & Dundas* v. *Ellzey*, 2 Cranch 445, 452–453 (1805). Nonetheless, neither respondents nor the Court of Appeals con-

actments expressly declared that the Authority would be a "public body corporate and politic . . . independent of all other bodies" with such powers as "conferred upon it by the legislative authorities of both the Commonwealth of Virginia and the District." 1985 Va. Acts, ch. 598, § 2; 1985 D. C. Law 6–67, § 3. The Transfer Act acknowledged that the Authority was to have only "the powers and jurisdiction as are conferred upon it jointly by the legislative authority of the Commonwealth of Virginia and the District of Columbia," § 2456(a), and was to be "independent of the . . . Federal Government," 49 U. S. C. App. § 2456(b)(1). Under the Transfer Act, the Secretary of Transportation and the Authority negotiated a lease that defined the powers and composition of the Board to be established. Lease, Art. 13, see App. to Pet. for Cert. 175a–176a. Even then, the Board could not come into existence until the state-created Authority adopted bylaws establishing it. Bylaws, Art. IV, see App. to Pet. for Cert. 151a–154a. To allay any doubt about the Board's provenance, both Virginia and the District amended their enabling legislation to make explicit the Authority's power to establish the Board under state law. See 1987 Va. Acts, ch. 665, § 5.A.5; 1987 D. C. Law 7–18, § 3(c)(2).

The specific features of the Board are consistent with its status as a state-created entity. As the Transfer Act and

---

tend that the Authority is a federal entity because its derives its authority from a delegation by the District as well as Virginia. For the purposes of separation-of-powers limitations, the power that the District delegated to the Authority operates as the functional equivalent of state or local power. Cf. *Key* v. *Doyle*, 434 U. S. 59, 68, n. 13 (1977); *District of Columbia* v. *John R. Thompson Co.*, 346 U. S. 100, 110 (1953). This conclusion follows with additional force since the District currently acts under "home rule" authority. See District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. 93–198, 87 Stat. 774 (1973). The majority does not suggest that the Authority's partial District of Columbia parentage furnishes a basis for subjecting the Board to separation-of-powers analysis. *Ante*, at 266.

the lease contemplated, the bylaws provide that the Board consist of nine Members of Congress whom the Board of Directors would appoint. 49 U. S. C. App. § 2456(f)(1); Lease, Art. 13A, App. to Pet. for Cert. 175a; Bylaws, Art. IV, § 1, App. to Pet. for Cert. 151a. But, again as contemplated by both the Transfer Act and lease, the bylaws also make clear that the Members of Congress sit not as congressional agents but "in their individual capacities," as "representatives of the users of the Metropolitan Washington Airports." *Ibid.* To ensure that the Board members protect the interests of nationwide users, the bylaws further provide that Members of Congress from Virginia, Maryland, and the District of Columbia would be ineligible. *Id.,* at 152a.

As the Court has emphasized, "[g]oing behind the plain language of a statute in search of a possibly contrary . . . intent is 'a step to be taken cautiously' even under the best of circumstances." *American Tobacco Co.* v. *Patterson,* 456 U. S. 63, 75 (1982) (quoting *Piper* v. *Chris-Craft Industries, Inc.,* 430 U. S. 1, 26 (1977)). Nowhere should this caution be greater than where the Court flirts with embracing "serious constitutional problems" at the expense of "constru[ing a] statute to avoid such problems." *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Construction Trades Council,* 485 U. S. 568, 575 (1988); see *Murray* v. *The Charming Betsy,* 2 Cranch 64, 118 (1804) (Marshall, C. J.). The majority nonetheless offers three reasons for taking just these steps. First, control over the airports "was originally in federal hands," and was transferred "only subject to the condition that the States create the Board." *Ante,* at 266. Second, "the Federal Government has a strong and continuing interest in the efficient operation of the airports." *Ibid.* Finally, and "[m]ost significant, membership on the Board of Review is limited to federal officials." *Ante,* at 266–267. In other words, Congress, in effect, created a body that, in effect, discharges an ongoing interest of the Federal Govern-

ment through federal officials who, in effect, serve as congressional agents.

This picture stands in stark contrast to that drawn in each of the applicable enactments and agreements which, as noted, establish a state-created authority given the power to create a body to safeguard the interests of nationwide travelers by means of federal officials serving in their individual capacities. We have, to be sure, held that separation-of-powers analysis "does not turn on the labeling of an activity," but instead looks to "practical consequences," *Mistretta* v. *United States*, 488 U. S. 361, 393 (1989). This observation, however, does not give the Court a license to supplant the careful work of the Authority, Virginia, the District, the Federal Executive, and Congress with its own in-house punditry. This is especially so when the instruments under consideration do not merely "label" but detail an arrangement in which any unconstitutional consequences are pure speculation.

As an initial matter, the Board may not have existed but for Congress, but it does not follow that Congress created the Board or even that Congress' role is a "factor" mandating separation-of-powers scrutiny. Congressional suggestion does not render subsequent independent state actions federal ones. Aside from the clear statutory language, the majority's conclusion ignores the entire series of voluntary and intervening actions, agreements, and enactments on the part of the Federal Executive, Virginia, the District, and the Authority, without which the Transfer Act would have been a nullity and the Board of Review would not have existed. Congress commonly enacts conditional transfers of federal resources to the States. See, *e. g.*, *Fullilove* v. *Klutznick*, 448 U. S. 448, (1980); *Lau* v. *Nichols*, 414 U. S. 563 (1974); *Steward Machine Co.* v. *Davis*, 301 U. S. 548 (1937). Separation-of-powers doctrine would know few bounds if such transfers compelled its application to the state enactments that result.

Likewise, nothing charges the Board with oversight of any strong and continuing interest of the Federal Government, much less with conducting such oversight as an agent of Congress. Despite disclaimers, the majority is quick to point to portions of the legislative history in which various Members of Congress state their belief that the Board would ensure congressional control over the airports. *Ante*, at 267–268. But that is not all the legislative history contains. Other statements support the declaration in all the relevant enactments that Members of Congress are to sit on a state-created body in their individual capacities to safeguard the interests of frequent, nationwide users. On this point Members of the House, the Senate, and the Executive agreed. Representative Hammerschmidt, for example, stated that the purpose of a "board of review composed of Congressmen is . . . to protect the interests of all users of the two airports." 132 Cong. Rec. 32143 (1986). Senator Kassebaum contended that Members of Congress could further this purpose since, "[m]ost Members are intensely interested in the amount of service to and from certain cities, from both National and Dulles." *Id.*, at 6069. Secretary of Transportation Dole echoed these sentiments, testifying that "Members of Congress are heavy users of the air transportation system." Hearing on H. R. 2337, H. R. 5040, and S. 1017 before the Subcommittee on Aviation of the House Committee on Public Works and Transportation, 99th Cong., 2d Sess., 110 (1986).

Considered as a creature of state law, the Board offends no constitutional provision or doctrine. The Court does not assert that congressional membership on a state-created entity, without more, violates the Incompatibility or Ineligibility Clauses. U. S. Const., Art. I, § 6, cl. 2. By their express terms, these provisions prohibit Members of Congress from serving in another *federal* office. They say nothing to bar congressional service in state or state-created offices. To the contrary, the Framers considered and rejected such a bar. 1 M. Farrand, Records of the Federal Convention of

1787, pp. 20–21, 217, 386, 389, 428–429 (1966 ed.). As Roger Sherman observed, maintaining a state-ineligibility requirement would amount to "erecting a Kingdom at war with itself." *Id.*, at 386. The historical practice of the First Congress confirms the Conventions sentiments, insofar as several Members simultaneously sat as state legislators and judges. See, *e. g.*, Biographical Directory of the United States Congress, 1774–1989, pp. 748, 1389, 1923 (1989). As the Court has held, actions by Members of the First Congress provide weighty evidence on the Constitution's meaning. *Bowsher* v. *Synar*, 478 U. S. 714, 723–724 (1986). Constitutional text and history leave no question but that Virginia and the District of Columbia could constitutionally agree to pass reciprocal legislation creating a body to which nonfederal officers would appoint Members of Congress functioning in their individual capacities. No one in this case contends otherwise.

## B

The Court's haste to extend separation-of-powers doctrine is even less defensible in light of the federal statute on which it relies. Far from transforming the Board into a federal entity, the Transfer Act confirms the Board's constitutionality inasmuch as that statute is a legitimate exercise of congressional authority under the Property Clause. U. S. Const., Art. IV, § 3, cl. 2. To overlook this fact the Court must once again ignore plain meaning, this time the plain meaning of the Court's controlling precedent regarding Congress' coextensive authority under the Spending Clause. *Ibid.*

As the majority acknowledges, in *South Dakota* v. *Dole*, 483 U. S. 203 (1987), the Court held that Congress could condition a grant of federal funds to a State on the State's raising the drinking age to 21, even assuming that Congress did not have the power to mandate a minimum national drinking age directly. As the majority fails to acknowledge, the Court's holding in no way turned on a State's "incentive and . . . ability to protect its own rights and powers." *Ante*, at

271. Rather, the Court stated that Congress could exercise its spending authority so long as the conditional grant of funds did not violate an " 'independent constitutional bar.' " *Dole, supra,* at 209 (quoting *Lawrence County* v. *Lead-Deadwood School Dist. No. 40–1,* 469 U. S. 256, 269–270 (1985)). *Dole* defined this constraint as follows:

> "[T]he 'independent constitutional bar' limitation on the spending power is not . . . a prohibition on the indirect achievement of objectives which Congress is not empowered to achieve directly. *Instead, we think that the language in our earlier opinions stands for the unexceptional proposition that the* [spending] *power may not be used to induce the States to engage in activities that would themselves be unconstitutional.* Thus, for example, a grant of federal funds conditioned on invidiously discriminatory state action or the infliction of cruel and unusual punishment would be an illegitimate exercise of the Congress' broad spending power. . . . Were South Dakota to succumb to the blandishments offered by Congress and raise its drinking age to 21, the State's action in so doing would not violate the constitutional rights of anyone." 483 U. S., at 210–211 (emphasis added).

*Dole* states only that Congress may not induce the States to engage in activities that would themselves have been unconstitutional in the absence of the inducement. The decision does not indicate that Congress can act only when its actions implicate "the allocation of power between the Federal Government and the States" *ante,* at 271, as opposed to principles, "the aim of which is to protect not the States but 'the whole people from improvident laws.' " *Ibid.* Nor could it. In the context of 42 U. S. C. § 1983, the Court has rejected any broad distinction between constitutional provisions that allocate powers and those that affirm rights. *Dennis* v. *Higgins,* 498 U. S. 439, 447–448 (1991). The majority's own application of its test to this case illustrates the difficulties in its position. The Court asserts that *Dole* cannot safeguard

the Board because separation-of-powers doctrine, ultimately, protects the rights of the people. By this logic, *Dole* itself would have had to come out the other way since the Twenty-first Amendment reinstated state authority over liquor, which in turn strengthened federalism, which in turn theoretically protects the rights of the people no less than separation-of-powers principles. See The Federalist No. 51, p. 323 (C. Rossiter ed. 1961) (J. Madison).

There is no question that *Dole*, when faithfully read, places the Board outside the scope of separation-of-powers scrutiny. As noted, no one suggests that Virginia and the District of Columbia could not have created a board of review to which nonfederal officers would appoint Members of Congress had Congress not offered any inducement to do so. The Transfer Act, therefore, did not induce the States to engage in activities that would themselves be unconstitutional. Nor is there any assertion that this case involves the rare circumstance in which "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion'" *Dole, supra,* at 211 (quoting *Steward Machine Co.,* 301 U. S., at 590). In *Dole,* Congress authorized the Secretary of Transportation to withdraw funding should the States fail to comply with certain conditions. Here, Congress merely indicated that federal control over National and Dulles Airports would continue given a failure to comply with certain conditions. Virginia and the District may sorely have wanted control over the airports for themselves. Placing conditions on a desire, however, does not amount to compulsion. *Dole* therefore requires precisely what the majority denies—the rejection of separation-of-powers doctrine as an "independent bar" against Congress conditioning the lease of federal property in this case.[2]

---

[2] This is not to say that Congress could condition a grant of property on a state enactment consenting to the exercise of *federal* lawmaking powers that Congress or its individual Members could not exercise consistently with

## II

Even assuming that separation-of-powers principles apply, the Court can hold the Board to be unconstitutional only by extending those principles in an unwarranted fashion. The majority contends otherwise, reasoning that the Constitution requires today's result whether the Board exercises executive *or* legislative power. *Ante,* at 274–276. Yet never before has the Court struck down a body on separation-of-powers grounds that neither Congress nor the Executive oppose. It is absurd to suggest that the Board's power represents the type of "legislative usurpatio[n] . . . which, by assembling all power in the same hands . . . must lead to the same tyranny," that concerned the Framers. The Federalist No. 48, *supra,* at 309–310 (J. Madison). More to the point, it is clear that the Board does not offend separation-of-powers principles either under our cases dealing with executive power or our decisions concerning legislative authority.[3]

### A

Based on its faulty premise that the Board is exercising federal power, the Court first reasons that "[i]f the [Board's] power is executive, the Constitution does not permit an

Article I. We do not have that situation here, for as explained, the Board does not exercise federal power.

[3] For these reasons, the Court's historical exposition is not entirely relevant. The majority attempts to clear the path for its decision by stressing the Framers' fear of overweaning legislative authority. *Ante,* at 272–274. It cannot be seriously maintained, however, that the basis for fearing legislative encroachment has increased or even persisted rather than substantially diminished. At one point Congress may have reigned as the pre-eminent branch, much as the Framers predicted. See W. Wilson, Congressional Government 40–57 (1885). It does so no longer. This century has witnessed a vast increase in the power that Congress has transferred to the Executive. See *INS* v. *Chadha,* 462 U. S. 919, 968–974 (1983) (WHITE, J., dissenting). Given this shift in the constitutional balance, the Framers' fears of legislative tyranny ring hollow when invoked to portray a body like the Board as a serious encroachment on the powers of the Executive.

agent of Congress to exercise it." *Ante*, at 276. The majority does not, however, rely on the constitutional provisions most directly on point. Under the Incompatibility and Ineligibility Clauses, Members of Congress may not serve in another office that is under the authority of the United States. U. S. Const., Art. I, § 6, cl. 2. If the Board did exercise executive authority that is federal in nature, the Court would have no need to say anything other than that congressional membership on the Board violated these express constitutional limitations. The majority's failure is either unaccountable or suggests that it harbors a certain discomfort with its own position that the Board in fact exercises significant federal power. Whichever is the case, the Court instead relies on expanding nontextual principles as articulated in *Bowsher* v. *Synar*, 478 U. S. 714 (1986). *Bowsher*, echoing *Springer* v. *Philippine Islands*, 277 U. S. 189 (1928), held that the Constitution prevented legislative agents from exercising executive authority. *Bowsher*, *supra*, at 726. The Court asserts that the Board, again in effect, is controlled by Congress. The analysis the Court has hitherto employed to recognize congressional control, however, show this not to be the case.

As *Bowsher* made clear, a "critical factor" in determining whether an official is "subservient to Congress" is the degree to which Congress maintains the power of removal. *Bowsher*, *supra*, at 727. Congress cannot "draw to itself, or to either branch of it, the power to remove or the right to participate in the exercise of " the removal of a federal executive officer. *Myers* v. *United States*, 272 U. S. 52, 161 (1926). Here Congress exercises no such power. Unlike the statutes struck down in *Bowsher* and *Myers*, the Transfer Act contains no provision authorizing Congress to discharge anyone from the Board. Instead, the only express mention of removal authority over Board members in any enactment occurs in resolutions passed by the Board of Directors under the bylaws. These resolutions provide that members of the

Board shall sit for fixed terms, but may be removed by the Board of Directors for cause. See Resolution No. 87–12 (June 3, 1987), App. 47–48; Resolution No. 87–27 (Sept. 2, 1987), App. 60. This arrangement is consistent with the settled principle that "the power of removal result[s] by a natural implication from the power of appointing." 1 Annals of Cong. 496 (1789) (statement of Rep. Madison). See *Carlucci* v. *Doe*, 488 U. S. 93, 99 (1988); *Myers, supra,* at 119.

The majority counters that Congress maintains "effective removal power over Board members because depriving a Board member of membership in [certain congressional] committees deprives the member of authority to sit on the Board." *Ante,* at 269. This conclusion rests on the faulty premise that the Transfer Act requires the removal of a Board member once he or she leaves a particular committee. But the Act does not say this. Rather, it merely states that members of the Board "shall consist" of Members of Congress who sit in certain specified committees. 49 U. S. C. App. § 2456(f)(1). Moreover, the Act elsewhere provides that the standard term of service on the Board is six years. § 2456(f)(2). This term, which spans three Congresses, suggests that a Board member's tenure need not turn on continuing committee or even congressional status. Nor, to date, has any member of the Board been removed for having lost a committee post. Tr. of Oral Arg. 11. Once again, the Court seizes upon a *less* plausible interpretation to reach a constitutional infirmity despite " '[t]he elementary rule . . . that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.' " *DeBartolo Corp.*, 485 U. S., at 575 (quoting *Hooper* v. *California*, 155 U. S. 648, 657 (1895)); see *Ashwander*, 297 U. S., at 348.

Nor has Congress improperly influenced the appointment process, which is ordinarily a less important factor in separation-of-powers analysis in any event. The Authority's Bylaws, reflecting the lease and the Transfer Act, provide that the Board consist of two members each from the House

Appropriations Committee, the House Public Works Committee, the Senate Appropriations Committee, and the Senate Commerce, Science and Transportation Committee, as well as an additional Member from the House or Senate. Bylaws, Art. IV, §4, App. to Pet. for Cert. 153a; see Lease, Art. 13A, App. to Pet. for Cert. 175a; 49 U. S. C. App. §2456(f)(1). The Board of Directors appoints members from lists provided by the Speaker of the House and the President *pro tempore* of the Senate. To the majority, these provisions add up to impermissible congressional control. Our cases point to the opposite conclusion.

Twice in recent Terms the Court has considered similar mechanisms without suggesting that they raised any constitutional concern. In *Bowsher*, the Court voiced no qualms concerning Presidential appointment of the Comptroller General from a list of three individuals suggested by the House Speaker and the President *pro tempore*. 478 U. S., at 727. Likewise, in *Mistretta*, the Court upheld Congress' authority to require the President to appoint three federal judges to the Sentencing Commission after considering a list of six judges recommended by the Judicial Conference of the United States. 488 U. S., at 410, n. 31. The majority attempts to distinguish these cases by asserting that the lists involved were merely recommendations whereas the Board *"must"* be chosen from the submitted lists at issue here. *Ante*, at 268–269. A fair reading of the requirement shows only that the Board may not be chosen outside the lists. It is perfectly plausible to infer that the directors are free to reject any and all candidates on the lists until acceptable names are submitted. It is difficult to see how the marginal difference that would remain between list processes in *Bowsher* and *Mistretta* on one hand, and in this case on the other, would possess any constitutional importance. In sharp contrast, *Springer* can be readily distinguished. In that instance, as in *Buckley* v. *Valeo*, 424 U. S. 1 (1976), the Court struck down a scheme in which the Legislature usurped for

itself the appointment authority of a coequal, coordinate branch of Government. *Springer,* 277 U. S., at 203, 205. Here Congress has neither expressly nor substantively vested appointment power in itself or appropriated appointment power properly lodged with the President.

Our recent case law also compels approval of the Board's composition. The majority makes much of the requirement that appointees to the Board must be members of the enumerated congressional committees. *Ante,* at 269. Committee membership, the argument goes, somehow belies the express declaration that Members of Congress are to sit in their individual capacities as representatives of frequent, nationwide travelers. *Mistretta,* however, refused to disqualify federal judges, sitting in their individual capacities, from exercising nonjudicial authority simply because they possessed judicial expertise relevant to their posts on the Sentencing Commission. It is difficult, then, to see why Members of Congress, sitting in their individual capacities, should be disqualified from exercising nonlegislative authority because their legislative expertise—as enhanced by their membership on key transportation and finance committees—is relevant to their posts on the Board. I refuse to invalidate the Board because its members are too well qualified.

## B

The majority alternatively suggests that the Board wields an unconstitutional legislative veto contrary to *INS* v. *Chadha,* 462 U. S. 919, 952–955 (1983). If the Board's "power is legislative," the Court opines, "Congress must exercise it in conformity with the bicameralism and presentment requirements of Art. I, § 7." *Ante,* at 276. The problem with this theory is that if the Board is exercising federal power, its power is not legislative. Neither does the Board itself serve as an agent of Congress in any case.

The majority never makes up its mind whether its claim is that the Board exercises legislative or executive authority.

The Court of Appeals, however, had no doubts, concluding that the Board's authority was "quintessentially executive." 286 U. S. App. D. C. 334, 342, 917 F. 2d 48, 56 (1990). Judge Mikva in dissent operated on the same assumption. See *id.*, at 344–347, 917 F. 2d, at 58–61. Accord, 718 F. Supp. 974, 986 (DC 1989); *Federal Firefighters Association, Local 1* v. *United States*, 723 F. Supp. 825, 826 (DC 1989). If federal authority is being wielded by the Board, the lower courts' characterization is surely correct. Before their transfer to the Authority, National and Dulles were managed by the Federal Aviation Administration, which in turn succeeded the Civil Aeronautics Agency. *Ante*, at 255. There is no question that these two agencies exercised paradigmatic executive power or that the transfer of the airports in no way altered that power, which is now in the hands of the Authority. In *Chadha*, by contrast, there was no question—at least among all but one Member of the Court—that the power over alien deportability was legislative. 462 U. S., at 951–959; *id.*, at 976, 984–989 (WHITE, J., dissenting). But see *id.*, at 959, 964–967 (Powell, J., concurring in judgment). *Chadha* is therefore inapposite. Even more questionable is reliance on *Bowsher* to suggest that requirements of bicameralism and presentment apply to the actions of a "quintessentially executive" entity. While a concurrence in that case explored this theory, 478 U. S., at 755 (STEVENS, J., concurring in judgment), the Court never so held, *id.*, at 732. The Board's authority is not of an order that the Court has ever held to be "an exercise of legislative power . . . subject to the standards prescribed in Art. I." *Chadha, supra*, at 957. The majority can make it so only by reaching past our precedents.

More important, the case for viewing the Board as a "congressional agent" is even less compelling in the context of Article I than it was with reference to Article II. *Chadha* dealt with a self-evident exercise of congressional authority in the form of a resolution passed by either House. 462 U. S., at

925. *Bowsher* involved a situation in which congressional control was at least arguable since the Comptroller General labored under numerous, express statutory obligations to Congress itself. See 478 U. S., at 741–746 (STEVENS, J.). Even then, the Court did not adopt the theory that such control subjected the actions of the Comptroller General to bicameralism and presentment requirements, but instead held that Congress' power of removal amounted to an unconstitutional intrusion on executive authority. *Id.*, at 727–734. Here, by contrast, the Board operates under no obligations to Congress of any sort. To the contrary, every relevant instrument declares that Members of Congress sit in their "individual capacities" as "representatives of the users of the Metropolitan Washington Airports." Bylaws, Art. IV, § 1, App. to Pet. for Cert. 151a; Lease, Art. 13A, App. to Pet. for Cert. 175a; 49 U. S. C. App. § 2456(f)(1). There may well be instances in which a significant congressional presence would mandate an extension of the principles set forth in *Chadha.* This, plainly, is not one.

### III

The majority claims not to retreat from our settled rule that "'[w]hen this Court is asked to invalidate a statutory provision that has been approved by both Houses of the Congress and signed by the President, . . . it should only do so for the most compelling constitutional reasons.'" *Mistretta,* 488 U. S., at 384 (quoting *Bowsher, supra,* at 736 (STEVENS, J.)). This rule should apply with even greater force when the arrangement under challenge has also been approved by what are functionally two state legislatures and two state executives.

Since the "compelling constitutional reasons" on which we have relied in our past separation-of-powers decisions are insufficient to strike down the Board, the Court has had to inflate those reasons needlessly to defend today's decision. I cannot follow along this course. The Board violates none of the principles set forth in our cases. Still less does it provide

a "blueprint for extensive expansion of the legislative power beyond its constitutionally confined role." *Ante*, at 277. This view utterly ignores the Executive's ability to protect itself through, among other things, the ample power of the veto. Should Congress ever undertake such improbable projects as transferring national parklands to the States on the condition that its agents control their oversight, see Brief for Respondents 39, there is little doubt that the President would be equal to the task of safeguarding his or her interests. Least of all, finally, can it be said that the Board reflects "[t]he propensity of the legislative department to intrude upon the rights, and to absorb the powers, of the other departments," that the Framers feared. The Federalist No. 73, at 442 (A. Hamilton). Accordingly, I dissent.