The PUERTO RICO PUBLIC HOUSING ADMINISTRATION, et al.,
Plaintiffs,

v.

UNITED STATES DEPARTMENT OF HOUSING & URBAN DEVELOPMENT, et al., Defendants.

No. Civ. 96–1304(PG).

United States District Court,
D. Puerto Rico.

July 9, 1999.

**313**

James F. Hibey, Verner, Liipert, Bernhard, McPherson and Hand, Chartered, Washington, DC, Mabel Ramon-Millan, Dept. of Justice for Puerto Rico, Fed. Lit. Div., San Juan, PR, William Sherman, Washington, DC, for plaintiffs.

Fidel A. Servillano-Del-Rio, U.S. Atty's Office District of Puerto Rico, Civil Div., Hato Rey, PR, for defendants.

### OPINION & ORDER

PEREZ–GIMENEZ, District Judge.

In March 13, 1996, the Puerto Rico Public Housing Administration, the Puerto Rico Department of Housing, and Myriam Alameda (hereinafter referred to as "PRPHA", "PRDH" and "Alameda" respectively), commenced the instant action against defendants United States Department of Housing & Urban Development (hereinafter referred to as "HUD") and the then Secretary of HUD, Henry Cisneros (hereinafter referred to as "the Secretary") seeking declaratory and injunctive relief because defendants have allegedly discriminated against plaintiffs in the formulation, calculation, and distribution of the operating subsidies that HUD provides to the states and United States territories to provide adequate housing to low-income citizens. Pending before this Court is defendants' motion for partial dismissal and limited discovery (Dkt.##17 and 19) and plaintiffs' opposition to said motion. (Dkt.##18 and 20).

### The Facts

PRPHA is a government instrumentality existing under the Laws of the Common-

wealth of Puerto Rico, Act. No. 66 (August 17, 1989), 17 L.P.R.A. § 1001, responsible for the maintenance and management of federally-funded public housing projects for the benefit of approximately 250,000 low-income residents of Puerto Rico. Pursuant to its Annual Contributions Contract (hereinafter referred to as "ACC") with HUD and the Housing and Community Development Act of 1974 (hereinafter referred to as "the Act"), 42 U.S.C. § 1437g, PRPHA receives federal funding from HUD for the maintenance and management of these public housing projects. PRPHA currently owns and operates 332 public housing developments comprised of approximately 57,345 units. PRDH, on the other hand, is the local agency that formulates and implements housing policy in the Island; said entity was created pursuant to Act No. 97 (June 10, 1972), as amended. Alameda is a Puerto Rican resident in the Commonwealth's public housing system.

The Housing Act of 1937, 42 U.S. § 1437 et seq., as amended by the Act, requires HUD to use its funding to help the "states", including Puerto Rico, 42 U.S.C. § 1437a(b)(7),[1] remedy unsafe and unsanitary housing conditions and the shortage of decent housing for poor families. HUD and the Secretary are required by the Act to provide local Public Housing Administrations (hereinafter referred to as "PHAs") with annual operating subsidies to make up the difference between the amount of rent the PHAs charge their tenants and the amount of the PHAs' operating costs. HUD provides these subsidies pursuant to ACCs with each PHA. It is the Secretary's responsibility to determine the amount of subsidy that each PHA is to receive annually. 42 U.S.C. § 1437g(a)(1)(A).

Sometime around 1970, HUD began providing each PHA in the Unites States, including PRPHA, with an operating sub-

---

**1.** Of course, Puerto Rico is not a state, but an unincorporated territory of the United States. *See Popular Democratic Party v. Commonwealth of Puerto Rico,* 24 F.Supp.2d 184 (1998), *mandamus denied,* November 9, 1998.

sidy to assist the PHA in paying its operating expenses not covered by rental or investment income. At that time, HUD calculated each PHA's operating subsidy by a "deficit-funding method." This method subtracted a PHA's operating expenses, which were subject to approval by HUD, from the PHA's annual income. The deficit comprised the operating subsidy funded by HUD. Because HUD had the power to disapprove any operating expenses projected or incurred by a PHA, the adequacy of operating subsidies calculated using the deficit-funding method was dependent upon HUD's actions as well as those of the PHAs.

In 1974, Congress passed the Act, which directed the Secretary to establish standards for PHAs' costs of operation and reasonable projections of income, taking into account the character and location of such PHAs as well as the characteristics of the families served, or the costs of providing comparable services as determined in accordance with a formula representing the operations of a prototype well-managed PHA. In 1975, defendants promulgated regulations establishing the Performance Funding System (hereinafter referred to as "PFS"), as the method to determine the appropriate subsidy each PHA receives. See 24 C.F.R. § 990 et seq. Congress incorporated the PFS program into the Act in 1988. 42 U.S.C. § 1437g(a)(3). Each PHA participating in the PFS no longer had its operating subsidy calculated by the deficit-funding method, but instead received a subsidy comprised of the difference between the PHA's allowable expenses and its projected income. The PFS was intended to remove HUD's direct approval of expenses, replacing it with a system that attempted to establish a standard for "well-managed" PHAs.

"Allowable Expenses" under the PFS are the aggregate of a PHA's allowable expense level (hereinafter referred to as "AEL"), allowable utilities level, and other expenses. The AEL is the primary ele-

ment for determining the amount of operating subsidy a PHA will receive from HUD. Under the PFS, defendants calculated each PHA's initial AEL, the "base year AEL," using the PHA's Fiscal Year 1975 approved operating expenses. For each subsequent year, the base year AELs were adjusted by a HUD-established inflation factor to determine the PHAs' annual operating subsidies. An appeal process was available in the first year under the PFS to those PHAs which believed their base year AELs had been set unreasonably low.

Because their operating subsidies were derived from a base year AEL, the PFS PHAs were no longer vulnerable to a reduction in their operating subsidies because of HUD disapproval of significant portions of their estimated operating expenses. Nevertheless, HUD's regulations explicitly excluded from the PFS the PHAs of Puerto Rico, Virgin Islands, Guam, and Alaska. 24 C.F.R. § 990.103(b). From approximately 1975 until 1984, therefore, defendants continued to calculate the operating subsidies for these PHAs, the "non-PFS PHAs," using the deficit-funding method.

On or around 1984, HUD calculated AELs for the PHAs of Guam, the Virgin Islands, and Alaska. These AELs were the equivalent of base year AELs for PFS PHAs and were used to calculate those PHAs' operating subsidies for all subsequent years. However, HUD did not calculate an AEL for Puerto Rico. Thus, from 1984 to 1989, PRPHA apparently was the only PHA in the United States that did not receive its subsidy based upon an AEL. Instead, PRPHA continued to operate under the deficit-funding method.

In 1988, Congress amended the Act to require, among other things, that defendants conduct a formal review to correct for inequities and abnormalities in PHAs' base year expense levels, to accurately reflect changes in operating circumstances since the initial determination of such base year expense levels, and to ensure that the

PHAs' AELs accurately reflected the cost of operating public housing in the localities where those PHAs operate. 42 U.S.C. § 1437g(a)(3)(B)(iii). Following the 1988 amendments to the Act, in 1989, for the first time, defendants calculated an initial base year AEL for Puerto Rico. In doing so, HUD used PRPHA's approved operating expenses from the year beginning July 1, 1987 (PRPHA's Fiscal Year 1988). HUD first used this base year AEL to determine PRPHA's operating subsidy for the twelve-month period beginning July 1, 1989 (PRPHA's Fiscal Year 1990).

In 1992, defendants implemented a formal review process to comply with their review obligations under the Act and to increase the AELs of PHAs whose subsidies fell below a certain percentage of what HUD calculated those subsidies should be. Defendants implemented the 1992 appeal process by creating a formula expense level (hereinafter referred to as "FEL") derived from certain characteristics of a PHA's housing stock. If a PHA's FEL was less than 85% of its AEL, the AEL would be increased to an amount equal to 85% of the PHA's FEL. All PFS PHAs had the opportunity to participate in the 1992 appeal process, although many chose not to do so.

PRPHA, which had an AEL well below every other comparable PHA, *(see Appendix),* participated in the 1992 appeal process. To establish a PHA's FEL, defendants tabulated and assigned weights to the following characteristics: (1) the number of pre–1940 rental units occupied by poor households as a percentage of the population of the community; (2) a local government wage rate index ("LGWI"); (3) the number of two-or-more bedroom units owned and operated by the PHA; (4) a ratio of three-or-more bedroom units owned by the PHA to total dwelling units; and (5) a ratio of two-or-more bedroom units owned by the PHA in high rise family projects to total dwelling units.

For purposes of the 1992 appeal process, HUD determined that a PHA could receive credit for only up to 15,000 two-or-more bedroom units. PRPHA, though, owns and operates approximately 47,000 two-or-more bedroom units. Rather than crediting PRPHA's FEL calculation with 15,000 two-or-more units, however, defendants acknowledged 6,025 only.[2]

During the 1992 appeal process, defendants used the local government wage index (hereinafter referred to as "LGWI"). The LGWI attempts to compare the average local government wage with the national average. The LGWIs for most PHAs were derived from data provided by the Federal Bureau of Labor Statistics or the Census Bureau, which maintain wage data on each state. However, since apparently there was no data on Puerto Rico available from the Federal Bureau of Labor Statistics or the Census Bureau, defendants estimated Puerto Rico's LGWI. After receiving defendants' LGWI estimate, PRPHA submitted to HUD local government wage data compiled by the Puerto Rico Department of Labor. Said data, which showed that the LGWI estimate for Puerto Rico was too low, was rejected by defendants.

Pursuant to the Public Housing Management Assessment Program (hereinafter referred to as "PHMAP"), 24, C.F.R. § 901 *et seq.,* HUD has designated PRPHA as "troubled" because it has failed to meet certain performance standards. PRPHA has carried this notorious designation since 1981. In an attempt to overcome its troubled status, PRPHA has entered into an agreement with HUD, in the form of a Six–Month Action Plan that explicitly recognizes that PRPHA must receive adequate and proper operating subsidy in order to meet its obligations and overcome the problems that led to its troubled status. Whether the Plan has worked or not is not at issue before this Court, but it is in

---

**2.** It seems that only one other PHA, New York City's, also owned and operated more than

15,000 of such units at the time of the 1992 appeal process.

this scenario and historical backdrop that the present action has been filed.

### The Allegations

Plaintiffs allege that defendants have illegally discriminated against plaintiffs, *inter alia*, and that such discrimination has manifested itself in the following ways:

(1) Throughout the period of time in which the PRPHA operated under the deficit-funding method, HUD refused to approve certain expenses necessary for adequate and efficient public housing in Puerto Rico;

(2) the base-year AEL established for PRPHA was inequitably low, and that defendants did not give PRPHA the opportunity to appeal the formulation of its base-year AEL, even though such an appeal process had been made available to PFS PHAs upon the setting of their AELs;

(3) PRPHA was the only participant in the 1992 appeal process that was not credited with its full number of two-or-more bedroom units;

(4) the 15,000 units-limit imposed by defendants is arbitrary and unfairly discriminates against PRPHA because PHAs with large numbers of one-bedroom units receive higher subsidies than PHAs with equivalent amounts of space divided into larger units;

(5) had New York City's PHA participated in the 1992 appeal process, HUD would have credited that PHA with 30,000 two-or-more bedroom units, double the 15,000 limit;

(6) defendants' discriminatory treatment based on the two-bedroom criteria has cost PRPHA up through the current fiscal year the amount of $367,309,081.00 in subsidies;

---

3. Plaintiffs allege that the use of the LGWI was based upon the (untrue, in the case of Puerto Rico) assumption that wage levels correlate with cost levels.

4. There are also claims under the "Administrative Procedures Act" (hereinafter referred to as "APA"), 5 U.S.C. § 702 *et seq.*, and more

---

(7) PRPHA's LGWI is far below that of any other PHA in the United States as a result of defendants' discriminatory intent;

(8) the FEL formula gives undue weight to the LGWI, thereby discriminating against Puerto Rico;[3]

(9) PRPHA was the only PHA in the United States that had local wage data rejected by defendants in calculating its LGWI and the only PHA for which defendants used estimated data;

(10) defendants' discriminatory use of the LGWI has deprived plaintiffs of $17,721,708 in subsidies to which they are entitled;

(11) HUD officials, including the Secretary, have been aware that PRPHA has been subjected to long-standing discrimination but as of this date they have done nothing to stop it, thus adversely affecting PRPHA's current subsidy;

(12) HUD has acknowledged that undeservedly low subsidies have hurt PRPHA's ability to comply with the PHMAP;

(13) due to defendants' discriminatory practices, Puerto Rico's public housing residents such as Alameda have suffered and continue to live under substandard conditions, deprived of basic maintenance services.

### Applicable Statutory Provisions

Plaintiffs' counts spring primarily from the following sources:[4]

#### I. *Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d*[5]

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that

[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in,

---

significantly, under the Equal Protection and Due Process Clauses of the United States Constitution. These constitutional provisions shall be addressed subsequently.

5. *See also* HUD's Title VI regulations, 24 C.F.R. § 1.4(b)

be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

The broadness of this statute is self-evident and its enforcement is equally broad: "Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d. . . ." 42 U.S.C. § 2000d–1. Among the alternatives that Federal entities have to enforce said provision include the refusal to continue any assistance until compliance is assured. *Id.*

Title VI has been applied in numerous contexts of discriminatory practices, including in settings such as education, *e.g. Radcliff v. Landau,* 883 F.2d 1481 (9th Cir.1989); *Serna v. Portales Mun. Sch.,* 499 F.2d 1147 (10th Cir.1974); *United States v. Texas,* 342 F.Supp. 24 (E.D.Tex. 1971), *aff'd,* 466 F.2d 518 (5th Cir.1972); employment, *e.g.,* 42 U.S.C. § 2000d–3; *Valentine v. Smith,* 654 F.2d 503 (8th Cir.), *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981); *Rowe v. General Motors Corp.,* 457 F.2d 348 (5th Cir. 1972); banking, *e.g., Laufman v. Oakley Bldg. & Loan Co.,* 408 F.Supp. 489 (S.D.Ohio 1976); health care programs, *e.g., Bryan v. Koch,* 627 F.2d 612 (2nd Cir.1980); political parties, *e.g., Freedom Republicans, Inc. v. Federal Election Comm'n,* 13 F.3d 412 (D.C.Cir.), *cert. denied,* 513 U.S. 821, 115 S.Ct. 84, 130 L.Ed.2d 36 (1994); recreational facilities, *e.g., Hawthorne v. Kenbridge Recreation Ass'n,* 341 F.Supp. 1382 (E.D.Va.1972); and most importantly for our purposes, housing, *e.g., Hills v. Gautreaux,* 425 U.S. 284, 96 S.Ct. 1538, 47 L.Ed.2d 792 (1976); *Metropolitan Hous. Dev. Corp. v. Village of Arlington Heights,* 558 F.2d 1283 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *Williamsburg Fair Hous. Comm. v. New York City Hous. Auth.,* 493 F.Supp. 1225 (S.D.N.Y.1980).

Title VI requires proof of disparate impact, not discriminatory intent, when plaintiffs are requesting declaratory or injunctive relief only. *Guardians Ass'n v. Civil Serv. Comm'n,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), *cert. denied* 463 U.S. 1228, 103 S.Ct. 3568, 77 L.Ed.2d 1410.[6] Furthermore, Title VI plaintiffs are not required to exhaust the administrative remedies available in order to file suit. *See generally Neighborhood Action Coalition v. Canton,* 882 F.2d 1012 (6th Cir.1989); *Chowdhury v. Reading Hosp. Med. Ctr.;* 677 F.2d 317 (3d Cir. 1982), *cert. denied,* 463 U.S. 1229, 103 S.Ct. 3569, 77 L.Ed.2d 1411 (1983).

II. *Title VIII of the Civil Rights Act of 1968 (also known as the "Fair Housing Act"), 42 U.S.C. § 3601 et seq.*

Title VIII or the "Fair Housing Act", in its pertinent portions of § 3604, declares as unlawful:

(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin.

(c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwell-

---

**6.** It is unclear whether discriminatory intent is required when plaintiffs are seeking money damages.

ing that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

(d) To represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available.

(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representation regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin.

Furthermore, Title VIII provides that the Secretary of HUD "shall ... administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(e)(5). In 1988, Congress amended the Fair Housing Act to extend its protection to handicapped individuals and families with children. Pub.L. No. 100–430, 102 Stat. 1619–39 (1988); 42 U.S.C. §§ 3604–3606, 3617.

Neither Congress nor the Supreme Court has decided whether Title VIII plaintiffs must prove discriminatory intent or the lesser standard of "disparate impact" in order to succeed on the merits, but the prevailing view is that disparate impact seems to be sufficient. *See generally United States v. Yonkers Bd. of Educ.*, 837 F.2d 1181, 1217 (2nd Cir.1987), *cert. denied*, 486 U.S. 1055, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). In any event, for purposes of the present motions it is unnecessary for the Court to address the merits of the case at bar.

### The Standards for Dismissal

Pursuant to Fed.R.Civ.P. 12(b)(1), a litigant's claims must be dismissed if the court lacks jurisdiction over the subject matter of the claim. Under Fed.R.Civ.P. 12(b)(6), a claim must be dismissed if it fails to state a basis upon which relief may be granted. Under both rules, the Court takes those allegations of the complaint as true and views the allegations in the light most favorable to the claimant. *E.g., Hart v. Mazur*, 903 F.Supp. 277, 279 (D.R.I. 1995).

### Legal Analysis & Discussion

#### I. Whether Plaintiff Alameda Lacks Standing

We shall first embark our analysis with the matter of standing because it is a "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Unfortunately, the doctrine of standing has become "one of the most confused areas of the law" thanks to the often erratic application of its principles. Chemerinsky, *Federal Jurisdiction* § 2.3.1, at 54 (1994). "The ingredients of standing are imprecise and not easily susceptible to concrete definitions or mechanical application." *United States v. AVX Corp.*, 962 F.2d 108, 113 (1st Cir.1992) (citations omitted).

Two parallel levels of analysis are thrust into the question of standing: the upper echelon, and the most important one, imposes constitutional limits; the lower but not insignificant one involves prudential concerns at stake in the efficient and equitable administration of justice. As to the former, "Article III's standing requirements are jurisdictional. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998). Those requirements are three-fold: (1) the plaintiff must have suffered, or be threatened with, an actual injury,[7] (2) traceable

---

7. A mere interest in an event—no matter how passionate or sincere the interest and no mat-

ter how charged with public import the event—will not substitute for an actual injury.

to the defendant, and (3) likely to be redressed by a favorable judicial decision." *Penobscot Air Services v. Federal Aviation Administration,* 164 F.3d 713, 727 (1st Cir.1999), *citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Dubois v. U.S. Dept. of Agriculture,* 102 F.3d 1273, 1281 (1st Cir.1996). These three requirements have often been casually dubbed as the "injury-in-fact", "causation", and "redressability" prongs of the inquiry on whether a plaintiff has standing to sue.[8] At its core, the standing doctrine seeks to have the proper party before the Court to avoid wasting judicial resources on speculative actions. *E.g., Winpisinger v. Watson,* 628 F.2d 133, 139 (D.C.Cir.), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980).

■ "[A] party to claim standing must have an interest distinct from that of every other citizen or taxpayer. This rubric rests on multiple concerns, including displeasure with claims by individuals whose interest is infinitely diluted, rests solely on ideological grounds, or could be replicated by an unlimited number of parties or would-be intervenors." *Daggett v. Commission on Governmental Ethics and Election Practices,* 172 F.3d 104, 110 (1st Cir.1999) (citations omitted).

In addition to its constitutional dimensions, the doctrine of standing also embraces prudential concerns regarding the proper exercise of federal jurisdiction. To this end, the Court has "embrace[d] several judicially self-imposed limits on the exercise of federal jurisdiction, such as the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984), *reh'g denied* 468 U.S. 1250, 105 S.Ct. 51, 82 L.Ed.2d 942. *See also Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343(1975).

■ In order to have standing, Alameda must satisfy the three-pronged test outlined in *Penobscot Air Services, supra.* Alameda claims that she has standing to sue because defendants' refusal to provide adequate funds to PRPHA and PRDH is the cause for her allegedly substandard housing conditions. (Complaint ¶¶ 61, 66, 83). However, a careful examination of the complaint reveals that Alameda's alleged harm cannot be traced to the defendants and furthermore, cannot be adequately fixed by the relief requested.

Alameda does not specify in which PRPHA housing project she lives. She also does not specify during what period of time HUD's underfunding caused her harm. Not only she does not purport to sue on behalf of other public housing residents, but fails as well to make any asser-

*See Diamond,* 476 U.S. 54, 62, 106 S.Ct. 1697, 90 L.Ed.2d 48 ("The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements."); *Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (insisting upon a showing of personal injury "prevents the judicial process from becoming no more than a vehicle for the vindication of the value interests of concerned bystanders"). *United States v. AVX Corp.,* 962 F.2d 108, 113 (1st Cir.1992). An exception to this general rule, however, is triggered when associations who have not suffered themselves an actual injury do have standing to sue on behalf of their members "provided that said members have suffered some distinct and palpable injury." *Id.* at 114, n. 5.

**8.** The redressability test requires a substantial likelihood, though not an absolute certainty, that the requested relief will redress the alleged injury. *See Metropolitan Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 265, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991); *Immigration & Naturalization Serv. v. Chadha,* 462 U.S. 919, 935–36,. 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983); *Duke Power Co. v. Carolina Envt'l. Study Group, Inc.,* 438 U.S. 59, 74–75, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

tion that PRPHA or any other entity advised her that the allegedly deteriorating conditions in PRPHA housing were due to a lack of funding from HUD. Indeed, the allegations of the complaint demonstrate that it is PRPHA's decisions regarding how and where to spend its HUD subsidies which have directly resulted in Alameda's alleged difficulties. It is insufficient for standing purposes merely to assert that the challenged action might have influenced the factors resulting in the alleged injury to the plaintiff if the alleged injury is just as likely to result from independent, intervening causal factors. *E.g., Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917,· 48 L.Ed.2d 450 (1976).

The Supreme Court has made it clear that the acts of an intervening entity will not deny standing to an injured plaintiff if that injury is "fairly traceable to a defendant's actions." *E.g., United States v. SCRAP,* 412 U.S. 669, 688–89, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). An "attenuated line of causation" does not automatically remove standing under a plaintiff's feet. *Id.* at 688, 93 S.Ct. 2405. Yet, these are not the circumstances before this Court. HUD, although a provider of subsidies to PRPHA, has no saying in any manner—direct or indirect—as to how PRPHA ought to manage the portion of its budget assigned specifically to Alameda's living place. Although a generous view of who has standing to sue under Title VIII has been adopted by the Supreme Court, *see Trafficante v. Metropolitan Life Ins. Co.,* 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972); *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 102 S.Ct. 1114, 71

L.Ed.2d 214 (1982), even the biggest continents know where the ocean starts.

A judgment entered in Alameda's favor could not be based upon a substantial likelihood that she would actually be compensated for the harm that she allegedly suffered or that her housing would improve, since PRPHA could distribute additional subsidies to other existing public housing units where Alameda does not reside, to cover administrative expenses or simply to build new facilities for potential residents in waiting list that currently are applying for public housing. Therefore, for lack of traceability as to cause, and absence of any substantial likelihood as to redressability, this Court holds that plaintiff Alameda is without standing in the instant action.

## II. Whether Sovereign Immunity Bars All Claims Except the APA Count

 It is "axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983). Unless there is express evidence of consent to be sued, suits against the sovereign must be dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction. *E.g., United States v. Sherwood,* 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) (the "terms of [the United States'] consent to be sued in any court define the court's jurisdiction to entertain the suit").[9] Such consent cannot be implied but must be explicitly stated and narrowly construed. See *Lane v. Pena,* 518 U.S. 187, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). Neither Title VI nor the statutory provision in Title VIII on which plaintiffs rely contains an explicit, independent waiver of sovereign immunity.[10]

---

9. It is worthy to note, though, that "[s]overeign immunity complicates not the right to assert such a claim, but the permissible scope of judicial relief if the claim is proved." *Alan Guttmacher Inst. v. McPherson,* 597 F.Supp. 1530, 1538–39 (S.D.N.Y.1984), *aff'd* 805 F.2d 1088 (2nd Cir.1986).

10. With regard to Title VIII, however, the statute itself provides that a court may award attorney's fees and costs against the United States. 42 U.S.C. § 3613(c)(2).

There is precedent to support the notion that there is no waiver of sovereign immunity in those cases where the target of the action is a receiver of federal funds. *See Unimex, Inc. v. U.S. Dept. of Housing and Urban Dev.*, 594 F.2d 1060, 1061, (5th Cir. 1979) ("the United States has not consented to suit under the civil rights statutes"); *United States v. Yonkers Bd. of Educ.*, 594 F.Supp. 466 (S.D.N.Y.1984) (Title VI claim barred by sovereign immunity). However, neither of these cases deal with the situation at issue here, where plaintiffs allege that the federal agency itself, as opposed to a receiver of federal funds, has actively carried out discriminatory policies.

 Citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), *reh'g denied* 338 U.S. 840, 70 S.Ct. 31, 94 L.Ed. 514; *Dugan v. Rank*, 372 U.S. 609, 621–622, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Gautreaux v. Romney*, 448 F.2d 731, 735 (7th Cir.1971); *Ogden v. United States*, 758 F.2d 1168, 1177 n. 5 (7th Cir. 1985); *Powelton Civic Home Owners Ass'n v. HUD*, 284 F.Supp. 809, 835 (E.D.Pa.1968); and *Nat'l Ass'n for Advancement of Colored People v. Levi*, 418 F.Supp. 1109, 1117 (D.D.C.1976) (citation omitted), plaintiffs argue that their suit is not barred because it is against the Secretary of HUD, and suits against federal officials who act unconstitutionally or ultra vires are not choked by the doctrine of sovereign immunity. However, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Hawaii v. Gordon*, 373 U.S. 57, 58, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963) (citations omitted). A judgment would operate against the United States "if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration," or "if the effect of the judgment would be to restrain the government from acting, or to compel it to act." *Dugan v. Rank*, 372

U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963) (citations omitted). "The applicability of the doctrine of sovereign immunity is to be determined, not by the party named as defendant, but by the result of the judgment or decree which may be entered." *Alabama Rural Fire Ins. Co. v. Naylor*, 530 F.2d 1221, 1225 (5th Cir.1976) (citations omitted).

Plaintiffs also assert that the doctrine of sovereign immunity is inapplicable to the case at bar because Congress has expressly consented to suits against HUD and the Secretary with regard to the Housing Act. Section 1404a of the Housing Act provides:

> The Secretary of Housing and Urban Development may sue and be sued only with respect to its functions under the United States Housing Act of 1937, as amended, and title II of Public Law 671. . . .

42 U.S.C. § 1404a(1996). Although the Supreme Court of the United States has determined that sue-and-be sued clauses "should be given hospitable scope," *Keifer & Keifer v. Reconstruction Fin. Corp.*, 306 U.S. 381, 390–91, 59 S.Ct. 516, 83 L.Ed. 784 (1939), and in *Lopez v. Arraras*, 606 F.2d 347, 353–354 (1st Cir.1979), the United States Court of Appeals for the First Circuit viewed § 1404a as a waiver of sovereign immunity allowing HUD to be joined as an indispensable party in a § 1437a(1) [11] violation suit, § 1404a "does not 'unequivocally express' an intent to extend this waiver to claims alleging violations of other housing acts or more generalized civil rights statutes. . . ." *Furtick v. Medford Housing Authority*, 963 F.Supp. 64, 72 (D.Mass.1997).

Plaintiffs cite *Baker v. F & F Inv. Co.*, 489 F.2d 829, 834 (7th Cir.1973) for the proposition that their claims under the civil rights statutes fall within the scope of the waiver contained in 42 U.S.C. § 1404a. In *Baker*, the Seventh Circuit held that 5 U.S.C. § 702, which contains

---

**11.** Brooke Amendment to the Housing Act of 1937.

a "sue and be sued" waiver provision closely analogous to 42 U.S.C. § 1404a, extends to claims brought against the Secretary of HUD under 42 U.S.C. §§ 1981 and 1982. This Court finds *Baker* unpersuasive. First, *Baker* was decided prior to the Supreme Court's pronouncement in [*United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)], that a waiver of sovereign immunity for monetary damages must be clear and unambiguous. Second, even before *Nordic Village*, several other courts that considered the issue held that the waiver provision contained in 42 U.S.C. § 1404a does not extend to claims under civil rights statutes such as 42 U.S.C. §§ 1981 and 1982. *See, e.g., Selden Apartments v. United States Dep't of Hous. & Urban Dev.*, 785 F.2d 152, 158 (6th Cir.1986); *United States v. Yonkers Board of Educ.*, 594 F.Supp. 466, 473 (S.D.N.Y.1984).

*Id.* at n. 22.[12] Similarly, the bar of sovereign immunity extends to constitutional claims. *See United States v. Timmons*, 672 F.2d 1373, 1380 (11th Cir.1982) ("claims based directly on Fifth Amendment violations are likewise barred by the doctrine of sovereign immunity"); *Kelly v. United States*, 512 F.Supp. 356, 362 (E.D.Pa.1981) ("Even where there exists a direct cause of action under the Constitution, the United States is not liable for the deprivation of constitutional rights unless it has waived immunity from suit....")

■ The matters recently discussed, though, must be qualified by the fact that sovereign immunity prohibits an award of money damages in certain circumstances, not suits against a federal agency or officer for injunctive and specific relief. *Jaimes v. Lucas Metro. Hous. Auth.*, 833 F.2d 1203, 1209 (6th Cir.1987). Therefore, plaintiffs' request declaratory and injunctive relief is not thwarted by sovereign immunity. The question is,

however, whether their prayer for $385,030,789 constitutes money damages, thus requiring this Court to determine whether the waiver of sovereign immunity has been clear and unequivocal, or whether it constitutes injunctive relief. Payment of money by the federal government does not necessarily entail "damages" per se. *Bowen v. Massachusetts*, 487 U.S. 879, 894, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (citations omitted). "Damages are given the plaintiff to substitute for a suffered loss, whereas specific remedies 'are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled.'" *Id.* at 895, 108 S.Ct. 2722 (citation omitted). Plaintiffs' request in the case at bar is not a compensation in substitution for a suffered loss, but funds to which they were allegedly entitled to from the very beginning back in 1975, date in which the alleged discrimination began. Therefore, this Court holds that plaintiffs' request for $385,030,789 is not barred by the doctrine of sovereign immunity.

**III. Whether Plaintiffs Possess an Implied Right of Action under Title VI or Title VIII**

■ The United States Supreme Court has generally been reluctant to recognize implied rights of action. In *J.I. Case Company v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), the Court enunciated a generous view, acknowledging implied rights of action whenever doing so would aid fulfilling the purpose of the pertinent statute. Subsequently, the Court announced in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) a four-pronged test that provided a more focused structure in the process of determining whether an implied right of action exists. These four factors are:

First, is the plaintiff one of the class for whose especial benefit the statute was enacted—that is, does the statute create a federal right in favor of the plaintiff?

12. *Nordic Village* was superseded by 11 U.S.C. § 106, but said provision relates to bankruptcy proceedings and is inapplicable to the matter before this Court at the present.

Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Id.* at 78, 95 S.Ct. 2080 (citations omitted). The *Cort* factors narrowed the potential occasions in which a right of action would be implied. Still, the Court proceeded to tighten the net even further, and in *Touche Ross & Co. v. Redington,* 442 U.S. 560, 576, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) it focused the inquiry primarily on "whether Congress, either expressly or by implication, intended to create a private right of action...." In other words, the *Cort* factors are not to be weighed equally anymore; instead, the emphasis should be placed on the second factor. Thus, "[t]he dispositive question remains whether Congress intended to create any such remedy." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 23, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979).

 In 20 U.S.C. § 1617, Congress mandated that

[u]pon the entry of a final order by a court of the United States against ... the United States (or any agency thereof) ... for discrimination on the basis of race, color or national origin in violation

of Title VI of the Civil Rights Act of 1964 ... the court ... may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.

Although this statute concerns discrimination with regard to education, the United States Supreme Court has recognized that the language indicates general Congressional intent regarding the right to sue under Title VI. In *Cannon v. University of Chicago,* 441 U.S. 677, 699, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (acknowledging of an implied right of action under Title IX) the Court addressed the issue squarely: "Congress itself understood Title VI ... as creating a private remedy." Although neither Title VI nor Title IX expressly mention a right of action, the legislative history surrounding Title IX suggests that Congress had in mind the provision of such a remedy because the same emulated Title VI, which at the time was assumed to bestow an implied right of action. *Id.* at 694–695, 99 S.Ct. 1946. Hence, defendants' argument that plaintiffs may not sue under Title VI because of an alleged lack of a right of action is without merit.[13]

In *Latinos Unidos De Chelsea En Acción v. Secretary of HUD,* 799 F.2d 774, 792–793 (1st Cir.1986), the Court of Appeals for the First Circuit dealt with the issue of whether Title VIII affords room for an implied right of action:

First, Congress explicitly created a judicial remedy for discrimination in the sale, rental, financing or brokerage of

---

**13.** Although plaintiff Alameda lacks standing to sue, such determination does not necessarily affect PRPHA's and PRDH's claims under Title VI. "Persons" that can sue pursuant to Title VI include corporations and governmental entities. *E.g., City of Chicago v. Lindley,* 66 F.3d 819, 828 (7th Cir.1995) (holding that the city has standing to raise its Title VI claim); *but see United States v. State of Alabama,* 791 F.2d 1450, 1456 (11th Cir.1986) (state university has no standing to sue a state board of education under Title VI), *reh'g denied* 796 F.2d 1478, *cert. denied* 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 144; *and Neighborhood Action Coalition v. City of Can-*

*ton, Ohio,* 882 F.2d 1012, 1016 (6th Cir.1989), *quoting International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Brock,* 477 U.S. 274, 282, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986) ("[A]n *association* has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither claim asserted nor the relief requested requires the participation of individual members in the lawsuit.") (emphasis added).

housing as prohibited by sections 3603, 3604, 3605 and 3606 of Title VIII. 42 U.S.C. § 3612(a). Second, Title VIII provides for the filing of complaints with the Secretary, which may lead to a civil suit by the complainant against the fund recipient if voluntary compliance is not obtained within thirty days. *Id.* at §§ 3610(a)–(d). Finally, Title VIII also provides that the Attorney General may bring suit to challenge a "pattern or practice" of discrimination. *Id.* at § 3613. In view of these provisions, it is unlikely that "Congress absentmindedly forgot to mention an intended private action" against HUD under section 3608(d).

(Citations omitted). *See also Cousins v. Secretary of the United States Department of Transportation,* 857 F.2d 37, 46 (1st Cir.1988) ("The plaintiff in [*N.A.A.C.P. v. Secretary of HUD,* 817 F.2d 149 (1st Cir. 1987) ] also sought a private remedy under Title VIII, and in reliance upon *Latinos,* we simply rejected the claim.").[14]

▬ Although plaintiffs' Title VIII claim specifically alludes to § 3608(e)(5), said section is parallel to 42 U.S.C. § 3608(d), which states: "All executive departments and agencies shall administer their programs and activities relating to housing and urban development (including any Federal agency having regulatory or supervisory authority over financial institutions) *in a manner affirmatively to further the purposes of this subchapter* and

shall cooperate with the Secretary to further such purposes." (Emphasis added). Since the *Latinos* Court concluded that a claim under § 3608(d) can only be pursued under the APA, *Id.* at 793, it is not unreasonable to reach a similar conclusion with regard to a claim pursuant to § 3608(e)(5). Therefore, plaintiffs' Title VIII claim shall be dismissed as any related grievance must be pursued under the APA.[15]

*IV. Whether PRPHA and PRDH are "Persons" within the Meaning of the Equal Protection and Due Process Clauses*[16]

▬ The Fourteenth Amendment to the United States Constitution states, *inter alia,* that no State shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."[17] Who or what was meant to be included into the term "person", though, is not as obvious as it may appear to be. In addition to natural individuals who are citizens of the United States, "person" encompasses: corporations, *Metropolitan Life Ins. Co. v. W.G. Ward,* 470 U.S. 869, 881 n. 9, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985), *reh'g denied* 471 U.S. 1120, 105 S.Ct. 2370, 86 L.Ed.2d 269 (1985); *Connecticut General Life Ins. Co. v. Johnson,* 303 U.S. 77, 58 S.Ct. 436, 82 L.Ed. 673 (1938); *Louis K. Liggett Co. v. Lee,* 288 U.S. 517, 536, 53 S.Ct. 481, 77 L.Ed. 929 (1933)[18]; illegitimate children,

---

**14.** Plaintiffs' surreply (Dkt.# 20) asserts that *Latinos* addresses Title VIII claims against recipient of federal funds engaged in discriminatory practices, rather than against HUD itself. It seems clear that if HUD itself is engaging in discriminatory practices, the Attorney General may bring suit under § 3613.

**15.** The Court, however, rejects the argument that public entities in general may not pursue Title VIII claims. *E.g., Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979) (holding that a municipal corporation has standing under Title VIII).

**16.** Even though Puerto Rico is not a state, as a United States territory it is bound by the

Fourteenth Amendment. *E.g., Rivas Tenorio v. Liga Atletica Interuniversitaria,* 554 F.2d 492 (1977).

**17.** The wording of the Fifth Amendment contains a similar Due Process Clause, but is silent as to "equal protection." Nevertheless, all the Fourteenth Amendment protections have been extended to the Fifth Amendment. *E.g., Rostker v. Goldberg,* 453 U.S. 57, 62 n. 3, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981).

**18.** But note that corporations are not citizens within the meaning of the Privileges and Immunities Clause. *Grosjean v. American Press Co.,* 297 U.S. 233, 244, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (citation omitted).

*Levy v. Louisiana,* 391 U.S. 68, 70, 88 S.Ct. 1509, 20 L.Ed.2d 436 (1968) (as to the Equal Protection Clause), *reh'g denied* 393 U.S. 898, 89 S.Ct. 65, 21 L.Ed.2d 185 (1968); juveniles, *Gault,* 387 U.S. 1, 12, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); aliens who are inhabitants and residents of the United States, *Terrace v. Thompson,* 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923); and inmates, *Laaman v. Hancock,* 351 F.Supp. 1265 (D.N.H.1972). However, said term does not include: states, *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (as to the Equal Protection Clause); *State of Alabama v. United States Equal Protection Agency,* 871 F.2d 1548, 1554 (11th Cir.), *cert. denied,* 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 535 (1989) (no protections afforded to the state under the Fifth Amendment); municipalities, *East St. Louis v. Circuit Court for Twentieth Judicial Circuit,* 986 F.2d 1142, 1144 (7th Cir. 1993) (both, as to the Fifth and Fourteenth Amendments); *see also Lewis v. Richardson,* 428 F.Supp. 1164, 1167 n. 3 (D.Mass. 1977), *but see Aguayo v. Richardson,* 473 F.2d 1090, 1100–01 (2nd Cir.1973) (dicta); foreign corporations, *Fire Ass'n of Philadelphia v. People of the State of New York,* 119 U.S. 110, 7 S.Ct. 108, 30 L.Ed. 342 (1886); and sadly and unfortunately, the human fetus. *Roe v. Wade,* 410 U.S. 113, 158, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), *reh'g denied* 410 U.S. 959, 93 S.Ct. 1409, 35 L.Ed.2d 694 (1973).[19]

For our purposes, we must determine whether PRPHA and PRDH, as instrumentalities of the Commonwealth of Puerto Rico, should be treated as a state or a municipality—thereby losing all their constitutional claims—or as a non-foreign corporation, in which case plaintiffs' constitutional claims could be pursued. Neither PRPHA nor PRDH have been authorized

to "sue and be sued", a standard clause in independent public corporations. There is also no indication that PRPHA and PRDH have an independent source for their funds, with the exception of a public housing improvement fund created in the Department of Treasury composed of donations, appropriations from the Legislature, income generated from the rent of public housing, and funds from federal agencies. 17 L.P.R.A. § 1011. Yet, even this statutory provision fails to convincingly persuade that either entity is self-sufficient or capable of producing its own funds to operate properly. Therefore, the Court holds that PRPHA and PRDH ought to be treated as intrinsically part of the Commonwealth of Puerto Rico. Having reached said conclusion, it seems inevitable to regard PRPHA and PRDH as "non-persons" for purposes of their constitutional claims. *See Delta Special School District No. 5 v. State Bd. of Educ.,* 745 F.2d 532 (1984) (a political subdivision of a state is not protected by the Fourteenth Amendment). Nevertheless, the analysis detailed above is flawed by failing to acknowledge the well-established parens-patriae doctrine.

"The [United States Supreme] Court has recognized the legitimacy of Parens patriae suits. It has, however, become settled doctrine that a State has standing to sue only when its sovereign or quasi-sovereign interests are implicated and it is not merely litigating as a volunteer the personal claims of its citizens." *Pennsylvania v. New Jersey,* 426 U.S. 660, 665, 96 S.Ct. 2333, 49 L.Ed.2d 124 (1976) (citations omitted). There are two possible ways in which a State can claim a quasi-sovereign interest: "First, a State has a quasi-sovereign interest in the health and well-being—both physical and economic of its residents in general. Second, a State has a quasi-sovereign interest in not being dis-

---

**19.** Thus, this Court finds the United States Court of Appeals for the Eighth Circuit's approach to the issue in *Reeder v. Kansas City Board of Police Commissioners,* 796 F.2d 1050, 1053 (8th Cir.), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 951, 93 L.Ed.2d 1000 (1987)

(Equal Protection Clause "protects people") as perhaps adequate for rule-of-thumb purposes, but not as an accurate portrayal of all the juridical developments that have affected its interpretation.

criminatorily denied its rightful status within the federal system." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). Both of these requirements are met by PRPHA and PRDH as instrumentalities of the Commonwealth of Puerto Rico since their action concerns the physical and economic well-being of low-income residents as well as the necessary funds to provide adequate public housing, allegedly denied due to HUD's discrimination on the basis of race or national origin. In dictum, however, the *Snapp* Court asserted that "[a] State does not have standing as parens patriae to bring an action against the Federal Government." *Id.* at 610 n. 16, 102 S.Ct. 3260 (citations omitted).[20] Yet, we must be careful "not go so far as to say that a state may never intervene by suit to protect its citizens against any form of unconstitutional acts of Congress...," *Massachusetts v. Mellon*, 262 U.S. 447, 485, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), or of any federal agency.

 The pivotal inquiry relates to the state's (and its agencies') goal in the instant action: If the state wants to "protect its citizens from the operation of a [federal] statute," it has no standing as parens patriae. *Holden v. Heckler*, 584 F.Supp. 463, 485 (N.D.Ohio 1984). Hence, a state can not attempt to exempt its citizens from the applicability of federal law. On the other hand, if by means of its suit the state seeks to enforce, rather than overturn or avoid, a federal statute, the parens patriae doctrine is triggered to drive the action forward. *Id.* Although defendants correctly distinguish *Washington Utilities & Transportation Commission v. F.C.C.*, 513 F.2d 1142, 1153 (9th Cir.1975) (*Mellon, supra,* is inapplicable when a state wants "to vindicate the congressional will by preventing what it asserts to be a violation of a statute by the administrative agency charged with its en-

forcement"), *cert. denied* 423 U.S. 836, 96 S.Ct. 62, 46 L.Ed.2d 54 (1975), since it "discusses state standing where a state commission and a federal authority have overlapping authority over inter- and intra-state telecommunications rate making and each are separately charged with exercising that authority for the benefit of the citizenry" (Reply at 26), there is persuasive precedent suggesting that the instant action ought not to be dismissed. *E.g., Carey v. Klutznick,* 637 F.2d 834, 838 (2nd Cir.1980) (New York State has standing to sue Census Bureau both on parens patriae grounds and of injury to its own interests), *rev'd on other grounds,* 653 F.2d 732 (2nd Cir.1981), *cert. denied* 455 U.S. 999, 102 S.Ct. 1630, 71 L.Ed.2d 866 (1982); *but see Graham v. Schweiker,* 545 F.Supp. 625, 627 (S.D.Fla.1982) (suit concerning regulations for refugee funding may not proceed against the federal government); *Pennsylvania v. Kleppe,* 533 F.2d 668, 676–77 (D.C.Cir.1976), *cert. denied* 429 U.S. 977, 97 S.Ct. 485, 50 L.Ed.2d 584 (1976) (principles of federalism prevented suit of Pennsylvania versus the Small Business Administration).

 The harm alleged by plaintiffs, is first suffered by PRPHA and PRDH themselves, but it is also suffered—if true—by all the public housing residents. Public housing residents, however, have slim chances surviving summary judgment in class action suit since it is difficult to find standing for them for the same reasons that this Court has determined that Alameda lacks standing. Due to the impossibility for private citizens to bring suit themselves against HUD within the present circumstances, PRPHA and PRDH, as instrumentalities of the Commonwealth of Puerto Rico, do have a quasi-sovereign interest, channeled through their parens patriae role, to protect public housing residents from invidious discrimination in the enforcement of federal statutes. There-

---

**20.** A city, as opposed to a state, usually lacks parens patriae standing. *See In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481

F.2d 122, 131 (9th Cir.1973), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973).

fore, it would be improper to dismiss PRPHA's and PRDH's constitutional claims.

### V. Whether the Statute of Limitations Limits the APA Claims to Final Agency Decisions Taken Up to Six Years before the Filing of this Action in March 14, 1996

The federal statute of limitations states as follows: "Except as provided by the Contract Disputes Act of 1978, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Said provision "applies to all civil actions whether legal, equitable or mixed," *Nesovic v. United States*, 71 F.3d 776, 778 (9th Cir.1995) (quoting *Spannaus v. U.S. Department of Justice*, 824 F.2d 52, 55 (D.C.Cir.1987)), including APA claims. *E.g., James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1094 (D.C.Cir.1996), *cert. denied* 519 U.S. 1077, 117 S.Ct. 737, 136 L.Ed.2d 676; *Village of Elk Grove Village v. Evans*, 997 F.2d 328, 331 (7th Cir.1993); *Wind River Mining Corp. v. United States*, 946 F.2d 710, 712–13 (9th Cir.1991).

"The failure to sue the United States within the period of limitations is not simply a waivable defense; it deprives the district court of jurisdiction to entertain the action." *Nesovic*, 71 F.3d at 777–78 (citation omitted). *See also Walters v. Secretary of Defense*, 725 F.2d 107, 112 n. 12 (D.C.Cir.1983), *reh'g denied* 737 F.2d 1038 (1984); 14 Wright, Miller & Cooper, Federal Practice and Procedure § 3654 (1985). Since the statute of limitations is jurisdictional, it must be strictly construed. *E.g., Lehman v. Nakshian*, 453 U.S. 156, 160–161, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981) (no exceptions shall be implied) (*superseded on other grounds as stated in Elbaz v. Congregation Beth Judea*, 812 F.Supp. 802 (N.D.Ill.1992)). Thus, the statute of limitations begins to run when "facts which would support a cause of action are apparent or should be apparent to a person with reasonable prudent regard for his rights." *Rozar v. Mullis*, 85 F.3d 556, 561—62 (11th Cir.1996).

This Court need not imply an exception to the federal statute of limitations that the Supreme Court of the United States has announced explicitly, namely the continuing violation theory. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982) (where challenge is not to just one incident but to an unlawful practice that continues into the limitation period, the complaint is timely); *see also Sabree v. United Brotherhood of Carpenters & Joiners Local No. 33*, 921 F.2d 396, 399 (1st Cir.1990) (distinguishing between serial and systemic violations). Since plaintiffs have alleged that HUD has discriminated continually against PRPHA and PRDH since 1975, defendants' statute of limitations objection does not hold water.

### VI. Whether Discovery Outside of the Administrative Records Concerning HUD's Funding Decisions Is Inappropriate

If there is an existing administrative record and if this Court were to find that the sole justiciable question in this action is whether under the APA, HUD's weighting of two factors in its analysis of PRPHA's FEL in the course of the 1992 appeals process was arbitrary or capricious, then it is black letter law that "[t]he factfinding capacity of the district court is ... typically unnecessary to judicial review of agency decisionmaking." *Florida Power & Light v. Lorion*, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). "In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). Even when constitutional claims have been made, wide-ranging discovery is not blindly authorized at a stage in which an administrative record is being reviewed.

*E.g. Rydeen v. Quigg,* 748 F.Supp. 900, 906 (D.D.C.1990) (allowing plaintiffs to submit two affidavits), *aff'd,* 937 F.2d 623 (D.C.Cir.1991), *cert. denied,* 502 U.S. 1075, 112 S.Ct. 974, 117 L.Ed.2d 138 (1992).

■ The case at bar, however, has no administrative record with regard to the Title VI and the constitutional claims, but only as to the 1992 appeal process to determine if Puerto Rico's FEL was, to put it succinctly, too low. Obviously, then, boilerplate principles of review serve poorly to address the matter pending before this Court. The United States Supreme Court has held that a plaintiff who is entitled to judicial review of its constitutional claims under the APA is entitled to discovery in connection with those claims. *See Webster v. Doe,* 486 U.S. 592, 604, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (noting that discovery was available against the Central Intelligence Agency in Title VII cases and that the district court could adequately protect these concerns under the APA). Furthermore, this Court is not dismissing all of plaintiffs' claims except those under the APA. To the contrary, the Court is allowing PRPHA and PRDH to pursue their constitutional claims, as well as their Title VI claim. Only the Title VIII claim has been limited to abide by the guidelines established in the APA. Therefore, discovery shall not be limited to the APA claims only.

## Conclusion

In sum, all of Alameda's claims are hereby **DISMISSED** for lack of standing. PRPHA's and PRDH's Equal Protection, Due Process, and Title VI claims shall remain alive in this forum and shall be subsequently addressed by another order detailing discovery matters. PRPHA's and PRDH's Title VIII claim shall be limited to whatever procedures are allowable under the APA and its appeal process and is also **DISMISSED** in order to be entertained by an administrative law judge or by the pertinent administrative agency. Defendants' motion for partial dismissal and limit of discovery, thus, is hereby **GRANTED IN PART,** and **DENIED IN PART.**

**IT IS SO ORDERED.**

### Appendix

A comparison of Puerto Rico's AEL for Fiscal Year 1993 with other relevant PHAs reveals that a substantial disparity between them:

| PHA | FY 1993 AEL | NUMBER OF UNITS |
| --- | --- | --- |
| Puerto Rico | $108 | 57,128 |
| Alaska | $515 | 1,253 |
| Virgin Islands | $278 | 4,420 |
| Atlanta | $219 | 14,301 |
| Baltimore | $286 | 18,088 |
| Boston | $285 | 12,454 |
| Chicago | $298 | 39,680 |
| Cuyahoga | $248 | 11,600 |
| Dade Co. | $217 | 11,155 |
| New Orleans | $184 | 13,402 |
| NYC | $398 | 156,180 |
| Newark | $337 | 10,579 |
| Philadelphia | $303 | 21,157 |
| Washington | $280 | 11,471 |